# JOINT ANTI-FASCIST REFUGEE COMMITTEE *v.* McGRATH, ATTORNEY GENERAL, ET AL.

NO. 8.

Argued October 11, 1950.—Decided April 30, 1951.

*O. John Rogge* and *Benedict Wolf* argued the cause for petitioner in No. 8. With them on the brief was *Murray A. Gordon.*

*David Rein* argued the cause for petitioners in No. 7. With him on the brief were *Abraham J. Isserman* and *Joseph Forer.*

*Allan R. Rosenberg* argued the cause and filed a brief for petitioners in No. 71.

*Solicitor General Perlman* argued the cause for respondents. With him on the briefs were *Assistant Attorney General Morison, James L. Morrisson* and *Samuel D. Slade.*

MR. JUSTICE BURTON announced the judgment of the Court and delivered the following opinion, in which MR. JUSTICE DOUGLAS joins:

In each of these cases the same issue is raised by the dismissal of a complaint for its failure to state a claim upon which relief can be granted. That issue is whether, in the face of the facts alleged in the complaint and therefore admitted by the motion to dismiss, the At-

torney General of the United States has authority to include the complaining organization in a list of organizations designated by him as Communist and furnished by him to the Loyalty Review Board of the United States Civil Service Commission. He claims to derive authority to do this from the following provisions in Part III, § 3, of Executive Order No. 9835, issued by the President, March 21, 1947:

"PART III—RESPONSIBILITIES OF CIVIL SERVICE COMMISSION

. . . . .

"3. The Loyalty Review Board shall currently be furnished by the Department of Justice the name of each foreign or domestic organization, association, movement, group or combination of persons which the Attorney General, after appropriate investigation and determination, designates as totalitarian, fascist, communist or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means.

"a. The Loyalty Review Board shall disseminate such information to all departments and agencies." 3 CFR, 1947 Supp., pp. 129, 131, 12 Fed. Reg. 1935, 1938.

The respective complaints describe the complaining organizations as engaged in charitable or civic activities or in the business of fraternal insurance. Each implies an attitude of cooperation and helpfulness, rather than one of hostility or disloyalty, on the part of the organization toward the United States. Two of the complaints deny expressly that the organization is within any classification specified in Part III, § 3, of the order.

For the reasons hereinafter stated, we conclude that, *if the allegations of the complaints are taken as true* (as they must be on the motions to dismiss), the Executive Order does not authorize the Attorney General to furnish the Loyalty Review Board with a list containing such a designation as he gave to each of these organizations without other justification. Under such circumstances his own admissions render his designations patently arbitrary because they are contrary to the alleged and uncontroverted facts constituting the entire record before us. The complaining organizations have not been afforded any opportunity to substantiate their allegations, but at this stage of the proceedings the Attorney General has chosen not to deny their allegations and has not otherwise placed them in issue.

Whatever may be his authority to designate these organizations as Communist upon undisclosed facts in his possession, he has not chosen to limit himself to that authorization. By his present procedure he has claimed authority so to designate them upon the very facts alleged by them in their own complaints. Self-serving or not, those allegations do not state facts from which alone a reasonable determination can be derived that the organizations are Communist. To defend such a designation of them, on the basis of the complaints alone, is an assertion of Presidential authority so to designate an organization at the option of the Attorney General without reliance upon either disclosed or undisclosed facts supplying a reasonable basis for the determination. It is that, and only that outer limit of the authority of the Attorney General that is now before us.

At least since 1939, increasing concern has been expressed, in and out of Congress, as to the possible presence in the employ of the Government of persons disloyal to it. This is reflected in the legislation, reports and executive orders culminating in Executive Order No.

9835.[1] That order announced the President's Employees Loyalty Program in the Executive Branch of the Government. It states that both "maximum protection must be afforded the United States against infiltration of disloyal persons into the ranks of its employees, and equal protection from unfounded accusations of disloyalty must be afforded the loyal employees of the Government: . . . ." It provides for the Loyalty Review Board and sets up a standard for refusals of and removals from employment on grounds relating to loyalty. It outlines the use to be made in that connection of the list of organizations to be furnished by the Attorney General.[2] The

---

[1] *E. g.*, § 9A of the Hatch Political Activity Act, August 2, 1939, 53 Stat. 1148, 5 U. S. C. (1946 ed., Supp. III) § 118j; Smith Act, June 28, 1940, 54 Stat. 670, now 18 U. S. C. (1946 ed., Supp. III) §§ 2385, 2387; Voorhis Anti-Propaganda Act, October 17, 1940, 54 Stat. 1201, now 18 U. S. C. (1946 ed., Supp. III) § 2386; many appropriation act riders barring the use of funds to pay "any person who advocates, or who is a member of an organization that advocates, the overthrow of the Government of the United States by force or violence: . . ." such as that at 55 Stat. 42; Exec. Order No. 9300, "Establishing the Interdepartmental Committee to Consider Cases of Subversive Activity on the Part of Federal Employees," February 5, 1943, 3 CFR, 1943 Cum. Supp., p. 1252, 8 Fed. Reg. 1701; and Exec. Order No. 9806, "Establishing the President's Temporary Commission on Employee Loyalty," November 25, 1946, 3 CFR, 1946 Supp., p. 183, 11 Fed. Reg. 13863. See also, *United States* v. *Lovett,* 328 U. S. 303, 308–313. A later expression of congressional policy appears in Title I (the Subversive Activities Control Act of 1950) of the Internal Security Act of 1950 (the McCarran Act) of September 23, 1950, 64 Stat. 987. This requires any "Communist-action organization" or "Communist-front organization" to register with the Attorney General (§ 7) and provides for hearings before a newly created "Subversive Activities Control Board" (§§ 12, 13).

[2]                              "PART V—STANDARDS

"1. The standard for the refusal of employment or the removal from employment in an executive department or agency on grounds relating to loyalty shall be that, on all the evidence, reasonable grounds

organizations to be designated on that list are not limited to those having federal employees in their memberships. They may even exclude such employees from membership. Accordingly, the impact of the Attorney General's list is by no means limited to persons who are subject to the Employees Loyalty Program.

The Attorney General included each of the complaining organizations in the list he furnished to the Loyalty Review Board November 24, 1947. That list was disseminated by the Board to all departments and agencies of the United States December 4, 1947. 13 Fed. Reg. 1473.[3] The complaints allege that such action resulted

---

exist for belief that the person involved is disloyal to the Government of the United States.

"2. Activities and associations of an applicant or employee which may be considered in connection with the determination of disloyalty may include one or more of the following:

.    .    .    .    .

"f. Membership in, affiliation with or sympathetic association with any foreign or domestic organization, association, movement, group or combination of persons, designated by the Attorney General as totalitarian, fascist, communist, or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means." 3 CFR, 1947 Supp., p. 132, 12 Fed. Reg. 1938.

[3] As published in the Federal Register, March 20, 1948, the list includes two groups. The first group contains none of the present complainants. The Attorney General explains that that group "is reported as having been previously named as subversive by the Department of Justice and as having been previously disseminated among the Government agencies for use in connection with consideration of employee loyalty under Executive Order No. 9300, issued February 5, 1943 . . . ." 13 Fed. Reg. 1473. The second group includes each of the complaining organizations. The Attorney General lists this group, with the first, under the general heading "Appendix A—List of Organizations Designated by the Attorney General Pursuant to

in nationwide publicity and caused the injuries to the complaining organizations which are detailed later. September 17, 1948, during the pendency of the instant cases but before action upon the appeals in any of them, "the Attorney General furnished the Loyalty Review Board with a consolidated list containing the names of all of the organizations previously designated by him as within Executive Order 9835, segregated according to the classifications enumerated in section 3, Part III, on the basis of dominant characteristics." [4]  He enumerated six classifications and classified the three complaining organizations as "Communist." [5]

---

Executive Order No. 9835." 5 CFR, 1949, c. II, Pt. 210, pp. 199–201, 13 Fed. Reg. 1471, 1473. He then places the second group under the following subheading: "Under Part III, section 3, of Executive Order No. 9835, the following additional organizations are designated: . . . ." *Id.*, at 201, 13 Fed. Reg. 1473.

[4] 13 Fed. Reg. 6137–6138. This classification was disseminated to all departments and agencies September 21, 1948, and the classified list was published October 21, 1948, as an amendment to 5 CFR, 1949, c. II, Pt. 210, pp. 200–202, 203–205.

[5] The six classifications were: "Totalitarian," "Fascist," "Communist," "Subversive," "Organizations Which Have 'Adopted a Policy of Advocating or Approving the Commission of Acts of Force and Violence to Deny Others Their Rights Under the Constitution of the United States,'" and "Organizations Which 'Seek to Alter the Form of Government of the United States by Unconstitutional Means.'" 5 CFR, 1949, c. II, Pt. 210, pp. 203–205, 13 Fed. Reg. 6137–6138.

The Attorney General also explained that—

"Applying the elementary rule of statutory construction, each of these classifications must be taken to be independent and mutually exclusive of the others. It may well be that a designated organization, by reason of origin, leadership, control, purposes, policies or activities, alone or in combination, may fall within more than one of the specified classifications. In such cases a reasonable interpretation of the Executive order would seem to require that designation be predicated upon its dominant characteristics rather than extended to include all other classifications possible on the basis of what may be subordinate attributes of the group. In classifying the designated

The instant cases originated in the District Court for the District of Columbia and come here after affirmance by the Court of Appeals. We granted certiorari because of the importance of the issues and their relation to the Employees Loyalty Program. No. 8, 339 U. S. 910; No. 7, 339 U. S. 956; No. 71, 340 U. S. 805.

## No. 8.—The Refugee Committee Case

The complainant is the Joint Anti-Fascist Refugee Committee, an unincorporated association in the City and State of New York. It is the petitioner here. The defendants in the original action were the Attorney General, Tom C. Clark, and the members of the Loyalty Review Board. J. Howard McGrath has been substituted as the Attorney General and he and the members of that Board are the respondents here.

The following statement, based on the allegations of the complaint, summarizes the situation before us: The complainant is "a charitable organization engaged in relief work" which carried on its relief activities from 1942 to 1946 under a license from the President's War Relief Control Board. Thereafter, it voluntarily submitted its program, budgets and audits for inspection by the Advisory Committee on Voluntary Foreign Aid of the United States Government. Since its inception, it has, through voluntary contributions, raised and disbursed funds for the benefit of anti-Fascist refugees who assisted the Government of Spain against its overthrow by force and violence. The organization's aims and purposes "are to raise, administer and distribute funds for the relief and rehabilitation of Spanish Republicans in exile and other

organizations the Attorney General has been guided by this policy. Accordingly, it should not be assumed that an organization's dominant characteristic is its only characteristic." *Id.*, at 203, 13 Fed. Reg. 6137.

anti-fascist refugees who fought in the war against Franco." [6]

It has disbursed $1,011,448 in cash, and $217,903 in kind, for the relief of anti-Fascist refugees and their families. This relief has included money, food, shelter, educational facilities, medical treatment and supplies, and clothing to recipients in 11 countries, including the United States. The acts of the Attorney General and the Loyalty Review Board, purporting to be taken by them under authority of the Executive Order, have seriously and irreparably impaired, and will continue to so impair, the reputation of the organization and the moral support and good will of the American people necessary for the continuance of its charitable activities. Upon information and belief, these acts have caused many contributors, especially present and prospective civil servants, to reduce or discontinue their contributions to the organization; members and participants in its activities have been "vilified and subjected to public shame, disgrace, ridicule and obloquy . . ." thereby inflicting upon it economic injury and discouraging participation in its activities; it has been hampered in securing meeting places; and many people have refused to take part in its fund-raising activities.

This complaint does not contain an express denial that the complaining organization is within the classifications

---

[6] The complaint adds that—

"Before the end of the war in Europe, this relief consisted of: (1) the release and assistance of those of the aforesaid refugees who were in concentration camps in Vichy France, North Africa and other countries; (2) transportation and asylum for those of the aforesaid refugees in flight; (3) direct relief and aid, to those of the aforesaid refugees requiring help, through the Red Cross and other international agencies. At the present time, the Joint Anti-Fascist Refugee Committee relief work is principally devoted to aiding those Spanish Republican refugees, and other anti-fascist refugees who fought against Franco, located in France and Mexico."

named in Part III, § 3, of Executive Order No. 9835. It does, however, state that the actions of the Attorney General and the Loyalty Review Board which are complained of are unauthorized and without warrant in law and amount to a deprivation of the complainant's rights in violation of the Constitution; that Executive Order No. 9835, on its face and as construed and applied, violates the First, Fifth, Ninth and Tenth Amendments to the Constitution of the United States and that § 9A of the Hatch Act, 53 Stat. 1148, 5 U. S. C. (1946 ed., Supp. III) § 118j, insofar as it purports to authorize the instant application of the order, is void.[7] It asks for declaratory and injunctive relief, alleging that the complaining organization is suffering irreparable loss and that no adequate remedy is available to it except through the equity powers of the District Court. That court granted a motion to dismiss the complaint for its failure to state a claim upon which relief could be granted and denied the complainant's motion for a preliminary injunction.[8] The Court of Appeals affirmed, one judge dissenting. 85 U. S. App. D. C. 255, 177 F. 2d 79.

## No. 7.—The National Council Case

In this case the court below relied upon its decision in the *Refugee Committee* case and reached the same result, *per curiam* (unreported). Except as indicated below in our summary of the facts alleged, this case, for our purposes, is like the first. The complainants, who are the

---

[7] Executive Order No. 9835 purports to rest, in part, upon the authority of § 9A of the Hatch Act. 3 CFR, 1947 Supp., p. 129, 12 Fed. Reg. 1935.

[8] In this case, unlike the others, the complainant asked that a three-judge District Court be convened, pursuant to 28 U. S. C. (1946 ed.) § 380a, now part of 28 U. S. C. (1946 ed., Supp. III) §§ 2281–2284. The District Court, however, dismissed the complaint without convening such a court.

petitioners here, are the National Council of American-Soviet Friendship, Inc., a New York nonprofit membership corporation, organized in 1943; the Denver Council of American-Soviet Friendship, a Colorado unincorporated association and local affiliate of the National Council; and six individual officers and directors of one or the other of these organizations. The purpose of the National Council "is to strengthen friendly relations between the United States and the Union of Soviet Socialist Republics by disseminating to the American people educational material regarding the Soviet Union, by developing cultural relations between the peoples of the two nations, and by combatting anti-Soviet propaganda designed to disrupt friendly relations between the peoples of these nations and to divide the United Nations." The complaint alleges that all of the complainants are seriously and irreparably injured in their capacity to conduct the National Council's educational, cultural and fundraising program, and that the individual complainants have suffered personal losses such as the removal of one from an assistant rectorship of a church, the loss by another of a teaching position, and numerous cancellations of lecturing and professional engagements. The complaint expressly states that—

> "In all its activities the NATIONAL COUNCIL has sought to further the best interests of the American people by lawful, peaceful and constitutional means. It has never in any way engaged in any conduct or activity which provides any basis for it to be designated as 'totalitarian, fascist, communist or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means.' "

## No. 71.—The International Workers Case

The complaining organization, which is the petitioner here, is a fraternal benefit society, organized in 1930 as a corporation under the Insurance Law of the State of New York, operating for the mutual benefit of its members and their beneficiaries and not for profit. It is licensed and operates in the District of Columbia and several states; its purposes are comparable to those of fraternal benefit societies in general; it operates under a lodge system and has a representative form of government; at the time of the promulgation of the Department of Justice list it had 185,000 members, including employees of the Federal Government and of various states and municipalities; it provided life insurance protection for its membership exceeding $120,000,000; its activities have been the subject of administrative and judicial proceedings in addition to those before the insurance departments of the states in which it functions, and, as a result of such proceedings, "the purposes and activities of the order have been held to be free from any illegal or improper taint . . . ." [9] Among the allegations of damage, made upon information and belief, the complaint states that,

[9] The complaint also alleges in Part IV:

"8. The purpose, objectives and activities of the Order are in no sense subversive. The Order is not an organization within the meaning of Part III, section 3 of Executive Order No. 9835, and it has not adopted a policy of advocating or approving the commission of acts of force or violence, or to deny other persons the rights under the Constitution or as seeking to alter the form of government by unconstitutional means, but on the contrary, the Order is opposed to the commission of acts of force or violence, fights against the denial of rights to any person, and is opposed to the altering of our form of government by any illegal or unconstitutional means. The Order is dedicated to the democratic ideals and traditions of the United States and the principles of freedom and equality embodied in the Constitution."

solely as a result of the respondents' acts, there have been instituted against the order and its members a multiplicity of administrative proceedings, including those to rescind licenses, franchises, or tax exemptions, or to impede the naturalization of its members. Because of respondents' acts, many such members, especially present and prospective civil servants, have resigned or withdrawn from membership in the order, and many potential members have declined to join it.[10]

The second amended complaint was dismissed by the District Court, 88 F. Supp. 873. That judgment was affirmed by the Court of Appeals, one judge dissenting. 86 U. S. App. D. C. 287, 182 F. 2d 368.

---

If, upon the allegations in any of these complaints, it had appeared that the acts of the respondents, from which relief was sought, were authorized by the President under his Executive Order No. 9835, the case would have bristled with constitutional issues. On that basis the complaint would have raised questions as to the justiciability and

---

[10] The complaint attacks the constitutionality of § 9A of the Hatch Act but does not ask for the convening of a three-judge District Court.

In this case, A. L. Drayton, as a member of the order and a civil employee of the United States, sought permission from the District Court to intervene under Rule 24 (b) of the Federal Rules of Civil Procedure and to have added as defendants three members of the Loyalty Review Board of the Post Office Department. His motion was denied and his appeal from that denial dismissed. The respondents now advise us that, in a separate proceeding, he appealed to the Loyalty Review Board from a decision adverse to his loyalty, with the result that such decision has been reversed and that he has returned to duty. While he has not withdrawn his appeal from the denial of his motion to intervene, we find no reason to review the discretion exercised by the District Court in denying that motion. *Allen Calculators* v. *National Cash Register Co.,* 322 U. S. 137; see 4 Moore's Federal Practice (2d ed. 1950) 62–64.

merit of claims based upon the First, Fifth, Ninth and Tenth Amendments to the Constitution. It is our obligation, however, not to reach those issues unless the allegations before us squarely present them. See *United States* v. *Lovett,* 328 U. S. 303, 320. Cf. *United Public Workers* v. *Mitchell,* 330 U. S. 75; *Myers* v. *United States,* 272 U. S. 52.

The Executive Order contains no express or implied attempt to confer power on anyone to act arbitrarily or capriciously—even assuming a constitutional power to do so. The order includes in the purposes of the President's program not only the protection of the United States against disloyal employees but the "equal protection" of loyal employees against unfounded accusations of disloyalty. 3 CFR, 1947 Supp., p. 129, 12 Fed. Reg. 1935. The standards stated for refusal of and removal from employment require that "on all the evidence, reasonable grounds [shall] exist for belief that the person involved is disloyal . . . ." *Id.,* at 132, 12 Fed. Reg. 1938. Obviously it would be contrary to the purpose of that order to place on a list to be disseminated under the Loyalty Program any designation of an organization that was patently arbitrary and contrary to the uncontroverted material facts. The order contains the express requirement that each designation of an organization by the Attorney General on such a list shall be made only after an "appropriate . . . determination" as prescribed in Part III, § 3. An "appropriate" governmental "determination" must be the result of a process of reasoning. It cannot be an arbitrary fiat contrary to the known facts. This is inherent in the meaning of "determination." It is implicit in a government of laws and not of men. Where an act of an official plainly falls outside of the scope of his authority, he does not make that act legal by doing it and then invoking the doctrine of administrative construction to cover it.

It remains, therefore, for us to decide whether, *on the face of these complaints,* the Attorney General is acting within his authority in furnishing the Loyalty Review Board with a designation of the complaining organizations either as "Communist" or as within any other classification of Part III, § 3, of the order. In the *National Council* and *International Workers* cases, the complaining organization is alleged not only to be a civic or insurance organization, apparently above reproach from the point of view of loyalty to the United States, but it is also declared to be one that is not within any classification listed in Part III, § 3, of the order. In the *Refugee Committee* case, the negative allegations are omitted but the affirmative allegations are incompatible with the inclusion of the complaining organization within any of the designated classifications. The inclusion of any of the complaining organizations in the designated list solely on the facts alleged in the respective complaints, which must be the basis for our decision here, is therefore an arbitrary and unauthorized act. In the two cases where the complaint specifically alleges the factual absence of any basis for the designation, and the respondents' motion admits that allegation, the designation is necessarily contrary to the record. The situation is comparable to one which would be created if the Attorney General, under like circumstances, were to designate the American National Red Cross as a Communist organization. Accepting as common knowledge the charitable and loyal status of that organization, there is no doubt that, in the absence of any contrary claim asserted against it, the Executive Order does not authorize its inclusion by the Attorney General as a "Communist" organization or as coming within any of the other classifications named in Part III, § 3, of the order.

Since we find that the conduct ascribed to the Attorney General by the complaints is patently arbitrary, the defer-

138

ence ordinarily due administrative construction of an administrative order is not sufficient to bring his alleged conduct within the authority conferred by Executive Order No. 9835. The doctrine of administrative construction never has been carried so far as to permit administrative discretion to run riot. If applied to this case and compounded with the assumption that the President's Executive Order was drafted for him by his Attorney General, the conclusion would rest upon the premise that the Attorney General has attempted to delegate to himself the power to act arbitrarily. We cannot impute such an attempt to the Nation's highest law enforcement officer any more than we can to its President.

In thus emphasizing an outer limit to what can be considered an authorized designation of an organization under the order, the instant cases serve a valuable purpose. They demonstrate that the order does not authorize, much less direct, the exercise of any such absolute power as would permit the inclusion in the Attorney General's list of a designation that is patently arbitrary or contrary to fact.[11]

---

[11] The designation of these organizations was not preceded by any administrative hearing. The organizations received no notice that they were to be listed, had no opportunity to present evidence on their own behalf and were not informed of the evidence on which the designations rest. See *Chin Yow* v. *United States*, 208 U. S. 8.

We have noted the following recitals made by the Attorney General in describing his standard procedure in the preparation of his lists:

"After the issuance of Executive Order No. 9835 by the President, the Department of Justice compiled all available data with respect to the type of organization to be dealt with under that order. The investigative reports of the Federal Bureau of Investigation concerning such organizations were correlated. Memoranda on each such organization were prepared by attorneys of the Department. The list of organizations contained herein has been certified to the Board by the Attorney General on the basis of recommendations of attorneys of the Department as reviewed by the Solicitor General, the As-

When the acts of the Attorney General and of the members of the Loyalty Review Board are stripped of the Presidential authorization claimed for them by the respondents, they stand, on the face of these complaints, as unauthorized publications of admittedly unfounded designations of the complaining organizations as "Communist." Their effect is to cripple the functioning and damage the reputation of those organizations in their respective communities and in the nation. The complaints, on that basis, sufficiently charge that such acts violate each complaining organization's common-law right to be free from defamation. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement, Torts, § 559.[12]

These complaints do not raise the question of the personal liability of public officials for money damages caused by their ultra vires acts. See *Spalding* v. *Vilas*,

---

sistant Attorneys General, and the Assistant Solicitor General, and subsequent careful study of all by the Attorney General." 5 CFR, 1949, c. II, Pt. 210, pp. 199–200, 13 Fed. Reg. 1471.

These recitals, however, relate to the mechanics used rather than to the appropriateness of the determination or the justification for the respective designations. They fall short of disclosing that there has been such an administrative hearing as would offset the admissions of the specific allegations of the complaints which are inherent in the respondents' motions to dismiss. See Fed. Rules Civ. Proc., 12 (b) and 56 (c), and *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 401–402.

We have treated the designation of an organization by the Attorney General in his list as including his furnishing of that list to the Loyalty Review Board with knowledge of that Board's obligation to disseminate it to all departments and agencies of the Government.

[12] As an illustration of the meaning of § 559, the Restatement suggests:

"2. A writes in a letter to B that C is a member of the Ku Klux Klan. B lives in a community in which a substantial number of the

161 U. S. 483. They ask only for declaratory and injunctive relief striking the names of the designated organizations from the Attorney General's published list and, as far as practicable, correcting the public records.

The respondents are not immune from such a proceeding. Only recently, this Court recognized that "the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual . . . if it is not within the officer's statutory powers or, if within those powers . . . if the powers, or their exercise in the particular case, are constitutionally void." *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 701–702. The same is true here, where the acts complained of are beyond the officer's authority under the Executive Order.[13]

Finally, the standing of the petitioners to bring these suits is clear.[14] The touchstone to justiciability is injury

---

citizens regard this organization as a discreditable one. A has defamed C."

See also, *Spanel* v. *Pegler*, 160 F. 2d 619 (C. A. 7th Cir.); *Wright* v. *Farm Journal*, 158 F. 2d 976 (C. A. 2d Cir.); *Grant* v. *Reader's Digest Assn.*, 151 F. 2d 733 (C. A. 2d Cir.); *Mencher* v. *Chesley*, 297 N. Y. 94, 75 N. E. 2d 257; Prosser, Handbook of the Law of Torts, § 91; 171 A. L. R. 709–710, Note.

[13] We do not reach either the validity of the Employees Loyalty Program or the effect of the respondents' acts in furnishing and disseminating a comparable list in any instance where such acts are within the authority purportedly granted by the Executive Order. Cf. *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 289–292; *United States* v. *Butler*, 297 U. S. 1, 68–78; *Linder* v. *United States*, 268 U. S. 5, 17; *M'Culloch* v. *Maryland*, 4 Wheat. 316, 423.

[14] Rule 17 (b) of the Federal Rules of Civil Procedure gives unincorporated associations the right to sue in their own names for the enforcement of rights existing under the Constitution or laws of the United States. And see Restatement, Torts, § 561 (2) and Comment

to a legally protected right [15] and the right of a bona fide charitable organization to carry on its work, free from defamatory statements of the kind discussed, is such a right.

It is unrealistic to contend that because the respondents gave no orders directly to the petitioners to change their course of conduct, relief cannot be granted against what the respondents actually did. We long have granted relief to parties whose legal rights have been violated by unlawful public action, although such action made no direct demands upon them. *Columbia Broadcasting System* v. *United States,* 316 U. S. 407; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Buchanan* v. *Warley,* 245 U. S. 60; *Truax* v. *Raich,* 239 U. S. 33.[16] The complaints here amply allege past and impending serious damages caused by the actions of which the petitioners complain.

Nothing we have said purports to adjudicate the truth of petitioners' allegations that they are not in fact communistic. We have assumed that the designations made by the Attorney General are arbitrary because we are compelled to make that assumption by his motions to dismiss the complaints. Whether the complaining organizations are in fact communistic or whether the Attorney General possesses information from which he could rea-

---

*b* thereon. See also, *N. Y. Society for Suppression of Vice* v. *McFadden Publications,* 260 N. Y. 167, 183 N. E. 284; cf. *Pullman Co.* v. *Local Union No. 2928,* 152 F. 2d 493 (C. A. 7th Cir.).

[15] *Utah Fuel Co.* v. *National Bituminous Coal Comm'n,* 306 U. S. 56; *Shields* v. *Utah Idaho Central R. Co.,* 305 U. S. 177; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605.

[16] *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, 309–310, does not prescribe a contrary course. In that case we held that the Interstate Commerce Commission order fixing a rate base could not be attacked by a bill in equity when the base could be challenged in subsequent proceedings fixing the rate. No comparable alternative relief is available here.

sonably find them to be so must await determination by the District Court upon remand.

For these reasons, we find it necessary to reverse the judgments of the Court of Appeals in the respective cases and to remand each case to the District Court with instructions to deny the respondents' motion that the complaint be dismissed for failure to state a claim upon which relief can be granted.

*Reversed and remanded.*

MR. JUSTICE CLARK took no part in the consideration or decision of any of these cases.

MR. JUSTICE BLACK, concurring.

Without notice or hearing and under color of the President's Executive Order No. 9835, the Attorney General found petitioners guilty of harboring treasonable opinions and designs, officially branded them as Communists, and promulgated his findings and conclusions for particular use as evidence against government employees suspected of disloyalty. In the present climate of public opinion it appears certain that the Attorney General's much publicized findings, regardless of their truth or falsity, are the practical equivalents of confiscation and death sentences for any blacklisted organization not possessing extraordinary financial, political or religious prestige and influence. The Government not only defends the power of the Attorney General to pronounce such deadly edicts but also argues that individuals or groups so condemned have no standing to seek redress in the courts, even though a fair judicial hearing might conclusively demonstrate their loyalty. My basic reasons for rejecting these and other contentions of the Government are in summary the following:

(1) I agree with MR. JUSTICE BURTON that petitioners have standing to sue for the reason among others that they have a right to conduct their admittedly legitimate political, charitable and business operations free from unjustified governmental defamation. Otherwise, executive officers could act lawlessly with impunity. And, assuming that the President may constitutionally authorize the promulgation of the Attorney General's list, I further agree with MR. JUSTICE BURTON that this Court should not attribute to the President a purpose to vest in a cabinet officer the power to destroy political, social, religious or business organizations by "arbitrary fiat," and thus the methods employed by the Attorney General exceed his authority under Executive Order No. 9835.

(2) Assuming, though I deny, that the Constitution permits the executive officially to determine, list and publicize individuals and groups as traitors and public enemies, I agree with MR. JUSTICE FRANKFURTER that the Due Process Clause of the Fifth Amendment would bar such condemnation without notice and a fair hearing. My views previously expressed under similar circumstances are relevant here. *E. g.,* dissenting opinion in *Ludecke* v. *Watkins,* 335 U. S. 160, 173; and see *In re Oliver,* 333 U. S. 257.

(3) More fundamentally, however, in my judgment the executive has no constitutional authority, with or without a hearing, officially to prepare and publish the lists challenged by petitioners. In the first place, the system adopted effectively punishes many organizations and their members merely because of their political beliefs and utterances, and to this extent smacks of a most evil type of censorship. This cannot be reconciled with the First Amendment as I interpret it. See my dissent in *American Communications Assn.* v. *Douds,* 339 U. S. 382, 445. Moreover, officially prepared and proclaimed govern-

144

mental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments. U. S. Const., Art. I, §§ 9, 10. It is true that the classic bill of attainder was a condemnation by the legislature following investigation by that body, see *United States* v. *Lovett*, 328 U. S. 303, while in the present case the Attorney General performed the official tasks. But I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.[1]

There is argument that executive power to issue these pseudo-bills of attainder can be implied from the undoubted power of the Government to hire and discharge employees and to protect itself against treasonable individuals or organizations.[2] Our basic law, however, wisely

---

[1] In November 1794, there was introduced in Congress a resolution of public disapproval of certain "self-created Democratic societies" thought to be responsible for stirring up the people to insurrection. Madison opposed the resolution, apparently believing that if it were enacted it would be a bill of attainder. His views in this regard are reported as follows: "It is in vain to say that this indiscriminate censure is no punishment. If it falls on classes, or individuals, it will be a severe punishment. . . . Is not this proposition, if voted, a vote of attainder?" 4 Annals of Cong. 934 (1794).

[2] But compare Madison in Federalist Paper No. 42: "As treason may be committed against the United States, the authority of the United States ought to be enabled to punish it. But as new-fangled and artificial treasons have been the great engines by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other, the Convention have, with great judgment, opposed a barrier to this peculiar danger, by inserting a Constitutional definition of the crime, fixing the proof necessary for conviction of it, and restraining the Congress, even in punishing it, from extending the consequences of guilt beyond the person of its author."

withheld authority for resort to executive investigations, condemnations and blacklists as a substitute for imposition of legal types of penalties by courts following trial and conviction in accordance with procedural safeguards of the Bill of Rights.[3]

In this day when prejudice, hate and fear are constantly invoked to justify irresponsible smears and persecution of persons even faintly suspected of entertaining unpopular views, it may be futile to suggest that the cause of internal security would be fostered, not hurt, by faithful adherence to our constitutional guarantees of individual liberty. Nevertheless, since prejudice manifests itself in much the same way in every age and country and since what has happened before can happen again, it surely should not be amiss to call attention to what has occurred when dominant governmental groups have been left free to give uncontrolled rein to their prejudices against unorthodox minorities. As specific illustration, I am adding as an appendix Macaulay's account of a parliamentary proscription which took place when popular prejudice was high; this is only one out of many similar

---

[3] One purpose of the Attorney General's blacklist under Executive Order 9835 is for use as evidence against government employees tried for disloyalty before loyalty boards acting under the same Executive Order. Proof of membership in a blacklisted organization, or of association with its members, can weigh heavily against a government employee's loyalty. Thus an employee may lose his job because of the Attorney General's secret and *ex parte* action. This is well illustrated in the case of *Bailey* v. *Richardson*, 341 U. S. 918, decided today by an equally divided Court. The Loyalty Board's finding against Miss Bailey appears to have rested in part on her supposed association with such organizations and in part on secret unsworn hearsay statements communicated to the Board by anonymous informers. Judge Edgerton's dissenting opinion demonstrates how the entire loyalty program grossly deprives government employees of the benefits of constitutional safeguards. *Bailey* v. *Richardson*, 86 U. S. App. D. C. 248, 182 F. 2d 46, 66.

146

instances that readily can be found.[4]   Memories of such events were fresh in the minds of the founders when they forbade the use of the bill of attainder.

APPENDIX TO OPINION OF MR. JUSTICE BLACK.

James II, the last Stuart king of England, was driven from his throne in 1688 by William of Orange.   After a brief sojourn at Saint Germains in France, James landed in Ireland where he was supported by those Irish Catholics who had suffered greatly at the hands of the English Protestant colonists.   One of his first official acts was to call an Irish Parliament which enacted the bill of attainder described by the historian Macaulay as follows:

". . . [the Commons] respected no prerogative, however ancient, however legitimate, however salutary, if they apprehended that [James II] might use it to protect the race which they abhorred.   They were not satisfied till they had extorted his reluctant consent to a portentous law, a law without a parallel in the history of civilised countries, the great Act of Attainder.

"A list was framed containing between two and three thousand names.   At the top was half the peerage of Ireland.   Then came baronets, knights, clergymen, squires, merchants, yeomen, artisans, women, children.   No investigation was made.   Any member who wished to rid himself of a creditor, a rival, a private enemy, gave in the name to the clerk at the table, and it was generally inserted without discussion.   The only debate of which any account has come down to us related to the Earl of Strafford.   He had friends in the House who ventured to offer something in his favour.   But a few words from

---

[4] The Appendix is an illustration of persecution of Protestants by Catholics.   For instances of persecution of Catholics by Protestants, see my dissenting opinion in *American Communications Assn.* v. *Douds*, 339 U. S. 382, 445, particularly notes 3, 4 and 7.

Simon Luttrell settled the question. 'I have,' he said, 'heard the King say some hard things of that lord.' This was thought sufficient, and the name of Strafford stands fifth in the long table of the proscribed.

"Days were fixed before which those whose names were on the list were required to surrender themselves to such justice as was then administered to English Protestants in Dublin. If a proscribed person was in Ireland, he must surrender himself by the tenth of August. If he had left Ireland since the fifth of November 1688, he must surrender himself by the first of September. If he had left Ireland before the fifth of November 1688, he must surrender himself by the first of October. If he failed to appear by the appointed day, he was to be hanged, drawn, and quartered without a trial, and his property was to be confiscated. It might be physically impossible for him to deliver himself up within the time fixed by the Act. He might be bedridden. He might be in the West Indies. He might be in prison. Indeed there notoriously were such cases. Among the attainted Lords was Mountjoy. He had been induced by the villany of Tyrconnel to trust himself at Saint Germains: he had been thrown into the Bastile: he was still lying there; and the Irish parliament was not ashamed to enact that, unless he could, within a few weeks, make his escape from his cell, and present himself at Dublin, he should be put to death.

"As it was not even pretended that there had been any inquiry into the guilt of those who were thus proscribed, as not a single one among them had been heard in his own defence, and as it was certain that it would be physically impossible for many of them to surrender themselves in time, it was clear that nothing but a large exercise of the royal prerogative of mercy could prevent the perpetration of iniquities so horrible that no precedent could be found for them even in the lamentable history of the

148

troubles of Ireland. The Commons therefore determined that the royal prerogative of mercy should be limited. Several regulations were devised for the purpose of making the passing of pardons difficult and costly: and finally it was enacted that every pardon granted by his Majesty, after the end of November 1689, to any of the many hundreds of persons who had been sentenced to death without a trial, should be absolutely void and of none effect. Sir Richard Nagle came in state to the bar of the Lords and presented the bill with a speech worthy of the occasion. 'Many of the persons here attainted,' said he, 'have been proved traitors by such evidence as satisfies us. As to the rest we have followed common fame.'

"With such reckless barbarity was the list framed that fanatical royalists, who were, at that very time, hazarding their property, their liberty, their lives, in the cause of James, were not secure from proscription. The most learned man of whom the Jacobite party could boast was Henry Dodwell, Camdenian Professor in the University of Oxford. In the cause of hereditary monarchy he shrank from no sacrifice and from no danger. It was about him that William [of Orange] uttered those memorable words: 'He has set his heart on being a martyr; and I have set mine on disappointing him.' But James was more cruel to friends than William to foes. Dodwell was a Protestant: he had some property in Connaught: these crimes were sufficient; and he was set down in the long roll of those who were doomed to the gallows and the quartering block.

"That James would give his assent to a bill which took from him the power of pardoning, seemed to many persons impossible. . . . He might also have seen that the right course was the wise course. Had he, on this great occasion, had the spirit to declare that he would not shed the blood of the innocent, and that, even as respected the guilty, he would not divest himself of the power of tem-

pering judgment with mercy, he would have regained more hearts in England than he would have lost in Ireland. But it was ever his fate to resist where he should have yielded, and to yield where he should have resisted. The most wicked of all laws received his sanction; and it is but a very small extenuation of his guilt that his sanction was somewhat reluctantly given.

"That nothing might be wanting to the completeness of this great crime, extreme care was taken to prevent the persons who were attainted from knowing that they were attainted, till the day of grace fixed in the Act was passed. The roll of names was not published, but kept carefully locked up in Fitton's closet. Some Protestants, who still adhered to the cause of James, but who were anxious to know whether any of their friends or relations had been proscribed, tried hard to obtain a sight of the list; but solicitation, remonstrance, even bribery, proved vain. Not a single copy got abroad till it was too late for any of the thousands who had been condemned without a trial to obtain a pardon.

". . . That the colonists, when they had won the victory, grossly abused it, that their legislation was, during many years, unjust and tyrannical, is most true. But it is not less true that they never quite came up to the atrocious example set by their vanquished enemy during his short tenure of power."

3 Macaulay, History of England from the Accession of James the Second (London, 1855), 216–220. (Footnotes appearing in the original have been omitted.)

MR. JUSTICE FRANKFURTER, concurring.

The more issues of law are inescapably entangled in political controversies, especially those that touch the passions of the day, the more the Court is under duty to dispose of a controversy within the narrowest confines

that intellectual integrity permits. And so I sympathize with the endeavor of my brother BURTON to decide these cases on a ground as limited as that which has commended itself to him. Unfortunately, I am unable to read the pleadings as he does. Therefore I must face up to larger issues. But in a case raising delicate constitutional questions it is particularly incumbent first to satisfy the threshold inquiry whether we have any business to decide the case at all. Is there, in short, a litigant before us who has a claim presented in a form and under conditions "appropriate for judicial determination"? *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240.

## I.

Limitation on "the judicial Power of the United States" is expressed by the requirement that a litigant must have "standing to sue" or, more comprehensively, that a federal court may entertain a controversy only if it is "justiciable." Both characterizations mean that a court will not decide a question unless the nature of the action challenged, the kind of injury inflicted, and the relationship between the parties are such that judicial determination is consonant with what was, generally speaking, the business of the Colonial courts and the courts of Westminster when the Constitution was framed. The jurisdiction of the federal courts can be invoked only under circumstances which to the expert feel of lawyers constitute a "case or controversy." The scope and consequences of the review with which the judiciary is entrusted over executive and legislative action require us to observe these bounds fastidiously. (See the course of decisions beginning with *Hayburn's Case,* 2 Dall. 409, through *Parker* v. *Los Angeles County,* 338 U. S. 327.) These generalities have had myriad applications. Each application, even to a situation not directly pertinent to what

is before us, reflects considerations relevant to decision here. I shall confine my inquiry, however, by limiting it to suits seeking relief from governmental action.

(1) The simplest application of the concept of "standing" is to situations in which there is no real controversy between the parties. Regard for the separation of powers, see *Muskrat* v. *United States,* 219 U. S. 346, and for the importance to correct decision of adequate presentation of issues by clashing interests, see *Chicago & G. T. R. Co.* v. *Wellman,* 143 U. S. 339, restricts the courts of the United States to issues presented in an adversary manner. A petitioner does not have standing to sue unless he is "interested in and affected adversely by the decision" of which he seeks review. His "interest must be of a personal and not of an official nature." *Braxton County Court* v. *West Virginia,* 208 U. S. 192, 197; see also *Massachusetts* v. *Mellon,* 262 U. S. 447. The interest must not be wholly negligible, as that of a taxpayer of the Federal Government is considered to be, *Frothingham* v. *Mellon,* 262 U. S. 447; cf. *Crampton* v. *Zabriskie,* 101 U. S. 601. A litigant must show more than that "he suffers in some indefinite way in common with people generally." *Frothingham* v. *Mellon, supra,* at 488.

Adverse personal interest, even of such an indirect sort as arises from competition, is ordinarily sufficient to meet constitutional standards of justiciability. The courts may therefore by statute be given jurisdiction over claims based on such interests. *Federal Communications Comm'n* v. *Sanders Radio Station,* 309 U. S. 470; cf. *Interstate Commerce Comm'n* v. *Oregon-Washington R. Co.,* 288 U. S. 14.

(2) To require a court to intervene in the absence of a statute, however, either on constitutional grounds or in the exercise of inherent equitable powers, something more than adverse personal interest is needed. This additional element is usually defined in terms which assume the an-

swer.   It is said that the injury must be "a wrong which directly results in the violation of a legal right."   *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 479.   Or that the controversy "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co.* v. *Haworth, supra,* 300 U. S. at 240–241.   These terms have meaning only when contained by the facts to which they have been applied.   In seeking to determine whether in the case before us the standards they reflect are met, therefore, we must go to the decisions.   They show that the existence of "legal" injury has turned on the answer to one or more of these questions: (a) Will the action challenged at any time substantially affect the "legal" interests of any person? (b) Does the action challenged affect the petitioner with sufficient "directness"?   (c) Is the action challenged sufficiently "final"?   Since each of these questions itself contains a word of art, we must look to experience to find their meaning.

(a) *Will the action challenged at any time substantially affect the "legal" interests of any person?*   A litigant ordinarily has standing to challenge governmental action of a sort that, if taken by a private person, would create a right of action cognizable by the courts.   *United States* v. *Lee,* 106 U. S. 196.[1]   Or standing may be based on an interest created by the Constitution or a statute.   *E. g., Parker* v. *Fleming,* 329 U. S. 531; *Coleman* v. *Miller,* 307 U. S. 433; cf. *Bell* v. *Hood,* 327 U. S. 678.   But if no comparable common-law right exists and no such constitutional or statutory interest has been created, relief is not available judicially.   Thus, at least unless capricious discrimination is asserted, there is no protected interest in contracting with the Government.   A litigant therefore has no stand-

---

[1] The decisions are collected in the dissenting opinion in *Larson* v. *Domestic & Foreign Corp.,* 337 U. S. 682, 705.

ing to object that an official has misinterpreted his instructions in requiring a particular clause to be included in a contract. *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113. Similarly, a determination whether the Government is within its powers in distributing electric power may be of enormous financial consequence to a private power company, but it has no standing to raise the issue. *Tennessee Power Co.* v. *T. V. A.,* 306 U. S. 118; cf. *Alabama Power Co.* v. *Ickes,* 302 U. S. 464. The common law does not recognize an interest in freedom from honest competition; a court will give protection from competition by the Government, therefore, only when the Constitution or a statute creates such a right.

(b) *Does the action challenged affect petitioner with sufficient "directness"?* Frequently governmental action directly affects the legal interests of some person, and causes only a consequential detriment to another. Whether the person consequentially harmed can challenge the action is said to depend on the "directness" of the impact of the action on him. A shipper has no standing to attack a rate not applicable to him but merely affecting his previous competitive advantage over shippers subject to the rate. *Hines Trustees* v. *United States,* 263 U. S. 143, 148; *Sprunt & Son* v. *United States,* 281 U. S. 249, 255, 257. When those consequentially affected may resort to an administrative agency charged with their protection, courts are especially reluctant to give them "standing" to claim judicial review. See *Atlanta* v. *Ickes,* 308 U. S. 517; cf. *Associated Industries* v. *Ickes,* 134 F. 2d 694.[2]

---

[2] A statute may of course confer standing even in this situation. *Federal Communications Comm'n* v. *Sanders Radio Station,* 309 U. S. 470; *Columbia System* v. *United States,* 316 U. S. 407; cf. *Youngstown Co.* v. *United States,* 295 U. S. 476; *Stark* v. *Wickard,* 321 U. S. 288.

154

But it is not always true that only the person immediately affected can challenge the action. The fact that an advantageous relationship is terminable at will does not prevent a litigant from asserting that improper interference with it gives him "standing" to assert a right of action. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229. On this principle an alien employee was allowed to challenge a State law requiring his employer to discharge all but a specified proportion of alien employees, *Truax* v. *Raich,* 239 U. S. 33, and a private school to enjoin enforcement of a statute requiring parents to send their children to public schools, *Pierce* v. *Society of Sisters,* 268 U. S. 510. The likelihood that the interests of the petitioner will be adequately protected by the person directly affected is a relevant consideration, compare *Columbia System* v. *United States,* 316 U. S. 407, 423–424, with *Schenley Corp.* v. *United States,* 326 U. S. 432, 435, as is, probably, the nature of the relationship involved. See *Davis & Farnum Mfg. Co.* v. *Los Angeles,* 189 U. S. 207, 220; *Truax* v. *Raich,* 239 U. S. 33, 38–39.[3]

(c) *Is the action challenged sufficiently final?* Although a litigant is the person most directly affected by the challenged action of the Government, he may not have "standing" to raise his objections in a court if the action has not, as it were, come to rest.[4] Courts do not

---

[3] The *Davis & Farnum* case held that a subcontractor did not have standing to enjoin a municipal ordinance which prohibited a construction project in violation of a right of the owner of the land on which it was to be built. The Court held that the petitioner had no legal interest in the controversy, since his interest was only "indirect."

[4] Government action is "final" in the sense here involved when at no future time will its impact on the petitioner become more conclusive, definite, or substantial. "Finality" is also employed in a different sense with which we are not here concerned, in reference to judicial action not subject to subsequent revisory executive or legislative action. Cf. *United States* v. *Ferreira,* 13 How. 40.

review issues, especially constitutional issues, until they have to.  See *Parker* v. *Los Angeles County, supra,* and see Brandeis, J., concurring in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341.  In part, this practice reflects the tradition that courts, having final power, can exercise it most wisely by restricting themselves to situations in which decision is necessary.  In part, it is founded on the practical wisdom of not coming prematurely or needlessly in conflict with the executive or legislature.  See *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 130–131.  Controversies, therefore, are often held nonjusticiable "[w]here the action sought to be reviewed may have the effect of forbidding or compelling conduct on the part of the person seeking to review it, but only if some further action is taken by the Commission." *Rochester Tel. Corp.* v. *United States, supra,* at 129; and see *Chicago & S. Air Lines* v. *Waterman S. S. Corp.,* 333 U. S. 103.  There is no "standing" to challenge a preliminary administrative determination, although the determination itself causes some detriment to the litigant. *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299; cf. *Ex parte Williams,* 277 U. S. 267.  Nor does the reservation of authority to act to a petitioner's detriment entitle him to challenge the reservation when it is conceded that the authority will be exercised only on a contingency which appears not to be imminent.  *Eccles* v. *Peoples Bank,* 333 U. S. 426.  Lack of finality also explains the decision in *Standard Scale Co.* v. *Farrell,* 249 U. S. 571.  There the Court was faced by an advisory "specification" of characteristics desirable in ordinary measuring scales.  The specification could be enforced only by independent local officers' withholding their approval of the equipment.  Justiciability was denied.[5]

---

[5] The Court expressed the decision in terms of the nonlegislative character of the specification.  But since the validity of the specification could be determined in an action for injunction or mandamus

"Finality" is not, however, a principle inflexibly applied. If the ultimate impact of the challenged action on the petitioner is sufficiently probable and not too distant, and if the procedure by which that ultimate action may be questioned is too onerous or hazardous, "standing" is given to challenge the action at a preliminary stage. *Terrace* v. *Thompson,* 263 U. S. 197; *Santa Fe Pac. R. Co.* v. *Lane,* 244 U. S. 492; see *Waite* v. *Macy,* 246 U. S. 606. It is well settled that equity will enjoin enforcement of criminal statutes found to be unconstitutional "when it is found to be essential to the protection of the property rights, as to which the jurisdiction of a court of equity has been invoked." *E. g., Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 621.[6] And if the determination challenged creates a status which enforces a course of conduct through penal sanctions, a litigant need not subject himself to the penalties to challenge the determination. *La Crosse Tel. Corp.* v. *Wisconsin Board,* 336 U. S. 18; *Shields* v. *Utah Idaho R. Co.,* 305 U. S. 177.

(3) Whether "justiciability" exists, therefore, has most often turned on evaluating both the appropriateness of the issues for decision by courts and the hardship of denying judicial relief. This explains the inference to be drawn from the cases that "standing" to challenge official action is more apt to exist when that action is not within the scope of official authority than when the objection to the administrative decision goes only to its correctness. See *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, 314–315; *Pennsylvania R. Co.* v. *Labor Board,* 261

---

against the local officers, the decision does not establish that final administrative action is immune from review because it is not legislative in form.

[6] See also decisions treating as "justiciable" bills to enjoin regulations which create duties immediately enforceable by imposition of penalties. *Assigned Car Cases,* 274 U. S. 564; *United States* v. *Baltimore & O. R. Co.,* 293 U. S. 454.

U. S. 72; *Ex parte Williams,* 277 U. S. 267, 271.[7]   The objection to judicial restraint of an unauthorized exercise of powers is not weighty.[8]

## II.

The injury asserted in the cases at bar does not fall into any familiar category. Petitioner in No. 8, the Joint Anti-Fascist Refugee Committee, is, according to its complaint, an unincorporated association engaged in relief work on behalf of Spanish Republican refugees.

---

[7] In the *Los Angeles* case the Court thus supported its conclusion that the bill was not justiciable under general equity powers: "The investigation was undertaken in aid of the legislative purpose of regulation. In conducting the investigation, and in making the report, the Commission performed a service specifically delegated and prescribed by Congress. Its conclusions, if erroneous in law, may be disregarded. But neither its utterances, nor its processes of reasoning, as distinguished from its acts, are a subject for injunction." 273 U. S. at 314–315. *Pennsylvania R. Co.* v. *Labor Board,* 261 U. S. 72, was a bill to enjoin the Railroad Labor Board from publishing that the petitioner had violated its decision. Decisions of the Board were not legally enforceable; and the Court therefore concluded that they violated "no legal or equitable right of the complaining company." 261 U. S. at 85. The Court considered at length, however, the company's argument that the Board had been given no jurisdiction to decide the particular issue involved. That it found it necessary to decide this issue against the company on the merits indicates that it thought a stronger case for standing would have been presented had the decision been beyond the Board's authority. In *Ex parte Williams,* 277 U. S. at 271, there is a suggestion that a litigant may have standing to enjoin a tax assessment when the challenge is to the validity of the statute authorizing the assessment, although there would be no standing to challenge the assessment on the ground that it denied equal protection of the laws.

[8] Compare the decisions which hold that certain executive officers are not liable in suits for damages for erroneous or even malicious conduct in office, so long as they are acting within the scope of the authority given them. *Spalding* v. *Vilas,* 161 U. S. 483; *Gregoire* v. *Biddle,* 177 F. 2d 579.

158

Since its inception it has distributed relief totaling $1,229,351; currently it is committed to regular monthly remittances of $5,400. Its revenues have been obtained from public contributions, garnered largely at meetings and social functions. The National Council of American-Soviet Friendship, petitioner in No. 7, is a nonprofit membership corporation whose purpose is alleged to be to strengthen friendly relations between the United States and the Soviet Union by developing cultural relations "between the peoples of the two nations" and by disseminating in this country educational materials about Russia. It has obtained its funds through public appeals and through collections at meetings. Petitioner in No. 71 is the International Workers Order. Its complaint states that it is a fraternal benefit society, comprising over 1,800 lodges, with assets totaling approximately $5,000,000. Its members pay dues for the general expenses of the Order, and many of them make additional contributions for life, sickness and disability insurance. In addition to its insurance activities, the Order "attempts to encourage the preservation of the cultural heritages and artistic values developed . . . by the peoples of the different countries of the world and brought with them to the United States."

In November, 1947, each of these organizations was included in the list of groups designated by the Attorney General as within the provisions of Executive Order No. 9835, the President's Loyalty Order. The list was disseminated to all departments and agencies of the Government. Six months later, each was with more particularity labeled "communist." Each alleges substantial injury as a consequence. Publicity and meeting places have become difficult for the Refugee Committee and the Council to obtain. The federal tax exemptions of all three organizations have been revoked; licenses necessary to solicitation of funds have been denied the

Refugee Committee; and the New York Superintendent of Insurance has begun proceedings, in which a representative of the Attorney General of the United States has appeared, for dissolution of the Order. Most important, each of the organizations asserts that it has lost supporters and members, especially from present or prospective federal employees. Claiming that the injury is irreparable, each asks for relief by way of a declaratory judgment and an injunction.

The novelty of the injuries described in these petitions does not alter the fact that they present the characteristics which have in the past led this Court to recognize justiciability. They are unlike claims which the courts have hitherto found incompatible with the judicial process. No lack of finality can be urged. Designation works an immediate substantial harm to the reputations of petitioners. The threat which it carries for those members who are, or propose to become, federal employees makes it not a finicky or tenuous claim to object to the interference with their opportunities to retain or secure such employees as members. The membership relation is as substantial as that protected in *Truax* v. *Raich* and *Pierce* v. *Society of Sisters, supra*. And it is at least doubtful that the members could or would adequately present the organizations' objections to the designation provisions of the Order.

Only on the ground that the organizations assert no interest protected in analogous situations at common law, by statute, or by the Constitution, therefore, can plausible challenge to their "standing" here be made. But the reasons which made an exercise of judicial power inappropriate in *Perkins* v. *Lukens Steel Co., Tennessee Power Co.* v. *T. V. A.*, and *Alabama Power Co.* v. *Ickes, supra,* are not apposite here. There the injuries were such that, had they not been inflicted by the Government, they clearly could not have been redressed. In *Perkins* v. *Lukens*

*Steel Co.*, it was not asserted that the authority under which the Government acted was invalid; only the correctness of an interpretation of a statute in the course of the exercise of an admitted power was challenged. In the *Power* cases protection from competition was sought; but the thrust of the law is to preserve competition, not to give protection from it. The action there challenged, furthermore, was not directed at named individuals. Here, on the other hand, petitioners seek to challenge governmental action stigmatizing them individually. They object, not to a particular erroneous application of a valid power, but to the validity of the regulation authorizing the action. They point to two types of injury, each of a sort which, were it not for principles of governmental immunity, would be clearly actionable at common law.

This controversy is therefore amenable to the judicial process.[9] Its justiciability does not depend solely on the fact that the action challenged is defamatory. Not every injury inflicted by a defamatory statement of a government officer can be redressed in court. On the balance of all considerations, the exercise here of judicial power accords with traditional canons for access to courts without inroads on the effective conduct of government.

### III.

This brings us to the merits of the claims before the Court. Petitioners are organizations which, on the face of the record, are engaged solely in charitable or insurance activities. They have been designated "communist" by the Attorney General of the United States. This desig-

---

[9] A Denver affiliate of the National Council, joined as petitioner in No. 7, has standing identical with its parent. The individual petitioners in that suit, however, have as officers of the Council an interest which is too remote to justify finding the issues justiciable as to them.

nation imposes no legal sanction on these organizations other than that it serves as evidence in ridding the Government of persons reasonably suspected of disloyalty. It would be blindness, however, not to recognize that in the conditions of our time such designation drastically restricts the organizations, if it does not proscribe them. Potential members, contributors or beneficiaries of listed organizations may well be influenced by use of the designation, for instance, as ground for rejection of applications for commissions in the armed forces or for permits for meetings in the auditoriums of public housing projects. Compare Act of April 3, 1948, § 110 (c), 62 Stat. 143, 22 U. S. C. (Supp. III) § 1508 (c). Yet, designation has been made without notice, without disclosure of any reasons justifying it, without opportunity to meet the undisclosed evidence or suspicion on which designation may have been based, and without opportunity to establish affirmatively that the aims and acts of the organization are innocent. It is claimed that thus to maim or decapitate, on the mere say-so of the Attorney General, an organization to all outward-seeming engaged in lawful objectives is so devoid of fundamental fairness as to offend the Due Process Clause of the Fifth Amendment.

Fairness of procedure is "due process in the primary sense." *Brinkerhoff-Faris Co.* v. *Hill,* 281 U. S. 673, 681. It is ingrained in our national traditions and is designed to maintain them. In a variety of situations the Court has enforced this requirement by checking attempts of executives, legislatures, and lower courts to disregard the deep-rooted demands of fair play enshrined in the Constitution. "[T]his court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Con-

162

stitution. One of these principles is that no person shall be deprived of his liberty without opportunity, at some time, to be heard . . . ." *The Japanese Immigrant Case,* 189 U. S. 86, 100–101. "[B]y 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought." *Hagar v. Reclamation District,* 111 U. S. 701, 708. "Before its property can be taken under the edict of an administrative officer the appellant is entitled to a fair hearing upon the fundamental facts." *Southern R. Co. v. Virginia,* 290 U. S. 190, 199. "Whether acting through its judiciary or through its legislature, a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." *Brinkerhoff-Faris Co. v. Hill, supra,* 281 U. S. at 682.

The requirement of "due process" is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But "due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, "due process" cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, "due process" is compounded of history,

reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

Fully aware of the enormous powers thus given to the judiciary and especially to its Supreme Court, those who founded this Nation put their trust in a judiciary truly independent—in judges not subject to the fears or allurements of a limited tenure and by the very nature of their function detached from passing and partisan influences.

It may fairly be said that, barring only occasional and temporary lapses, this Court has not sought unduly to confine those who have the responsibility of governing by giving the great concept of due process doctrinaire scope. The Court has responded to the infinite variety and perplexity of the tasks of government by recognizing that what is unfair in one situation may be fair in another. Compare, for instance, *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, with *Ng Fung Ho* v. *White,* 259 U. S. 276, and see *Communications Comm'n* v. *WJR,* 337 U. S. 265, 275. Whether the *ex parte* procedure to which the petitioners were subjected duly observed "the rudiments of fair play," *Chicago, M. & St. P. R. Co.* v. *Polt,* 232 U. S. 165, 168, cannot, therefore, be tested by mere generalities or sentiments abstractly appealing. The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment.

Applying them to the immediate situation, we note that publicly designating an organization as within the proscribed categories of the Loyalty Order does not directly deprive anyone of liberty or property. Weight must also be given to the fact that such designation is not made by a minor official but by the highest law officer of the Government. Again, it is fair to emphasize that the individual's interest is here to be weighed against a claim of the greatest of all public interests, that of national security. In striking the balance the relevant considerations must be fairly, which means coolly, weighed with due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.

But the significance we attach to general principles may turn the scale when competing claims appeal for supremacy. Achievements of our civilization as precious as they were hard won were summarized by Mr. Justice Brandeis when he wrote that "in the development of our liberty insistence upon procedural regularity has been a large factor." *Burdeau* v. *McDowell*, 256 U. S. 465, 477 (dissenting). It is noteworthy that procedural safeguards constitute the major portion of our Bill of Rights. And so, no one now doubts that in the criminal law a "person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence." *In re Oliver*, 333 U. S. 257, 273. "The hearing, moreover, must be a real one, not a sham or a pretense." *Palko* v. *Connecticut*, 302 U. S. 319, 327. Nor is there doubt that notice and hearing are prerequisite to due process in civil proceedings, *e. g.*, *Coe* v. *Armour Fertilizer Works*, 237 U. S. 413. Only the narrowest exceptions, justified by history become part of the habits of our people or

by obvious necessity, are tolerated. *Ownbey* v. *Morgan,* 256 U. S. 94; *Endicott Johnson Corp.* v. *Encyclopedia Press,* 266 U. S. 285; see *Cooke* v. *United States,* 267 U. S. 517, 536.

It is against this background of guiding considerations that we must view the rather novel aspects of the situation at hand. It is not true that the evils against which the Loyalty Order was directed are wholly devoid of analogy in our own history. The circumstances attending the Napoleonic conflicts, which gave rise to the Sedition Act of 1798, 1 Stat. 596, readily come to mind. But it is true that the executive action now under scrutiny is of a sort not heretofore challenged in this Court. That of itself does not justify the *ex parte* summary designation procedure. It does make it necessary to consider its validity when judged by our whole experience with the Due Process Clause.

## IV.

The construction placed by this Court upon legislation conferring administrative powers shows consistent respect for a requirement of fair procedure before men are denied or deprived of rights. From a great mass of cases, running the full gamut of control over property and liberty, there emerges the principle that statutes should be interpreted, if explicit language does not preclude, so as to observe due process in its basic meaning. See, *e. g., Anniston Mfg. Co.* v. *Davis,* 301 U. S. 337; *American Power Co.* v. *S. E. C.,* 329 U. S. 90, 107–108; *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 49. Fair hearings have been held essential for rate determinations [10] and, generally, to de-

---

[10] The reasonableness of rates has of course been held in part a question for the courts. *Ohio Valley Co.* v. *Ben Avon Borough,* 253 U. S. 287; cf. *Chicago, M. & St. P. R. Co.* v. *Minnesota,* 134 U. S. 418. But to the extent that finality is accorded to the determination of an administrative agency, the Court has exacted a high standard

prive persons of property.[11]   An opportunity to be heard is constitutionally necessary to deport persons even though they make no claim of citizenship, and is accorded to aliens seeking entry in the absence of specific directions to the contrary.[12]   Even in the distribution by the Government of benefits that may be withheld, the opportunity of a hearing is deemed important.[13]

---

of procedural fairness.   *Ohio Bell Tel. Co.* v. *Commission*, 301 U. S. 292, 304; see *I. C. C.* v. *Louisville & N. R. Co.*, 227 U. S. 88; *United States* v. *Abilene & S. R. Co.*, 265 U. S. 274; *West Ohio Gas Co.* v. *Commission* (*No. 1*), 294 U. S. 63; *Railroad Comm'n* v. *Pacific Gas Co.*, 302 U. S. 388; *Morgan* v. *United States*, 304 U. S. 1; cf. *United States* v. *Illinois Central R. Co.*, 291 U. S. 457.

[11] In *Southern R. Co.* v. *Virginia*, 290 U. S. 190, the Court declared unconstitutional a state officer's *ex parte* order that a railroad install an overhead crossing.   Compare *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177, in which a comparable order of the Secretary of War, entered after hearing, was upheld.   In decisions involving local taxation for improvements, the Court has required that owners be given a hearing on valuation as well as on the question whether their property has been benefited whenever that determination has not been legislatively made.   See, *e. g., Embree* v. *Kansas City Road Dist.*, 240 U. S. 242; cf. *Anniston Mfg. Co.* v. *Davis*, 301 U. S. 337.   And although an individual's interest has been created by an *ex parte* decision, it may not be destroyed "without that character of notice and opportunity to be heard essential to due process of law."   *United States ex rel. Turner* v. *Fisher*, 222 U. S. 204, 208; *Garfield* v. *Goldsby*, 211 U. S. 249.   See also *Ex parte Robinson*, 19 Wall. 505.

[12] *The Japanese Immigrant Case*, 189 U. S. 86; see *Kwock Jan Fat* v. *White*, 253 U. S. 454; *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 49; cf. *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537. In *Lloyd Sabaudo Societa* v. *Elting*, 287 U. S. 329, the Court held that a steamship company required to pay a fine to obtain port clearance for a ship which had brought a diseased alien to this country was entitled to determination of the facts by fair procedure.   The Court disapproved in part *Oceanic Nav. Co.* v. *Stranahan*, 214 U. S. 320.

[13] In *Dismuke* v. *United States*, 297 U. S. 167, 172, the Court said that "in the absence of compelling language, resort to the courts to assert a right which the statute creates will be deemed to be curtailed only so far as authority to decide is given to the administrative officer. . . .   If he is authorized to determine questions of fact his

The high social and moral values inherent in the procedural safeguard of a fair hearing are attested by the narrowness and rarity of the instances when we have sustained executive action even though it did not observe the customary standards of procedural fairness. It is in these instances that constitutional compulsion regarding fair procedure was directly in issue. Thus it has been held that the Constitution cannot be invoked to prevent Congress from authorizing disbursements on the *ex parte* determination of an administrative officer that prescribed conditions are met. *United States* v. *Babcock,* 250 U. S. 328; cf. *United States ex rel. Dunlap* v. *Black,* 128 U. S. 40. The importation of goods is a privilege which, if Congress clearly so directs, may likewise be conditioned on *ex parte* findings. *Buttfield* v. *Stranahan,* 192 U. S. 470; cf. *Hilton* v. *Merritt,* 110 U. S. 97. Only by a close division of the Court was it held that at a time of national emergency, when war has not been closed by formal peace, the Attorney General is not required to give a hearing before denying hospitality to an alien deemed dangerous to public security. *Ludecke* v. *Watkins,* 335 U. S. 160; *United States ex rel. Knauff* v. *Shaughnessy,* 338 U. S. 537. Again, when decisions of administrative officers in execution of legislation turn exclusively on considerations similar to those on which the legislative body could itself have acted summarily, notice and hearing may not be commanded by the Constitution. *Bi-Metallic Co.* v. *Colorado,* 239 U. S. 441.[14]

decision must be accepted unless he exceeds his authority by making a determination which is arbitrary or capricious or unsupported by evidence, . . . or by failing to follow a procedure which satisfies elementary standards of fairness and reasonableness essential to the due conduct of the proceeding which Congress has authorized . . . ."

[14] Thus, no hearing need be granted on the question whether property is needed for a public use. *Rindge Co.* v. *Los Angeles,* 262 U. S. 700. Cf. *Martin* v. *Mott,* 12 Wheat. 19; *United States* v. *Bush & Co.,* 310 U. S. 371.

168

Finally, summary administrative procedure may be sanctioned by history or obvious necessity. But these are so rare as to be isolated instances. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272; *Springer* v. *United States*, 102 U. S. 586; *Lawton* v. *Steele*, 152 U. S. 133.

This Court is not alone in recognizing that the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society. Regard for this principle has guided Congress and the Executive. Congress has often entrusted, as it may, protection of interests which it has created to administrative agencies rather than to the courts. But rarely has it authorized such agencies to act without those essential safeguards for fair judgment which in the course of centuries have come to be associated with due process. See *Switchmen's Union* v. *National Mediation Board*, 320 U. S. 297; *Tutun* v. *United States*, 270 U. S. 568, 576, 577; *Pennsylvania R. Co.* v. *Labor Board*, 261 U. S. 72.[15] And when Congress

---

[15] Cf. *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294. In recent customs legislation Congress has required a hearing on objections to appraisement. 38 Stat. 187, as amended, 19 U. S. C. § 1501; see Freund, Administrative Powers over Persons and Property, 163. In numberless other situations Congress has required the essentials of a hearing. Among those that have come before this Court are removal orders of the Federal Reserve Board, *Board of Governors* v. *Agnew*, 329 U. S. 441; determinations under the Hatch Act, *Oklahoma* v. *Civil Service Comm'n*, 330 U. S. 127; induction orders under the draft law, *Estep* v. *United States*, 327 U. S. 114; minimum price orders of the Secretary of Agriculture, *Stark* v. *Wickard*, 321 U. S. 288; price control, *Yakus* v. *United States*, 321 U. S. 414; minimum wage determinations, *Opp Cotton Mills* v. *Administrator*, 312 U. S. 126; labor relations regulation, *Labor Board* v. *Mackay Radio Co.*, 304 U. S. 333; *Labor Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 47; *Shields* v. *Utah Idaho R. Co.*, 305 U. S. 177; *Inland Empire Council* v. *Millis*, 325 U. S. 697.

has given an administrative agency discretion to determine its own procedure, the agency has rarely chosen to dispose of the rights of individuals without a hearing, however informal.[16]

---

[16] In 1941 the Attorney General's Committee on Administrative Procedure reported that it "found in its investigation of the administrative process few instances of indifference on the part of the agencies to the basic values which underlie a fair hearing." These values it defined as follows: "Before adverse action is to be taken by an agency, whether it be denying privileges to an applicant or bounties to a claimant, before a cease-and-desist order is issued or privileges or bounties are permanently withdrawn, before an individual is ordered directly to alter his method of business, or before discipline is imposed upon him, the individual immediately concerned should be apprised not only of the contemplated action with sufficient precision to permit his preparation to resist, but, before final action, he should be apprised of the evidence and contentions brought forward against him so that he may meet them. He must be offered a forum which provides him with an opportunity to bring his own contentions home to those who will adjudicate the controversy in which he is concerned. The forum itself must be one which is prepared to receive and consider all that he offers which is relevant to the controversy." Final Report, p. 62.

The monographs prepared under the direction of the Committee support the conclusion that by statutory direction or administrative interpretation agencies consistently grant at least minimum rights of hearing. For example, the Walsh-Healey Act is enforceable by the Government's recovery of liquidated damages and by its withholding further contracts for a three-year period. Administrative hearings are employed for all contested action. Monograph of the Attorney General's Committee on Administrative Procedure, S. Doc. No. 186, 76th Cong., 3d Sess., Part 1, p. 7. It is generally the practice of the Veterans' Administration to grant hearings on request of claimants. Id., Part 2, p. 11. Hearings are granted on request on applications for permits from the Federal Alcohol Administration, id., Part 5, p. 6, and when licenses granted under the Grain Standards Act are suspended or revoked, id., Part 7, p. 10. The Federal Deposit Insurance Corporation determines admissibility of banks to membership without giving the applicant a hearing or formal opportunity to contradict the bank examiner's report. However, grounds for disapproval are reported to the applicant. Id., Part 13,

170

The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.[17]

An opportunity to be heard may not seem vital when an issue relates only to technical questions susceptible

p. 15. War Department officials grant hearings on applications to construct installations in navigable waters, except when it is clear that the application should or should not be granted. S. Doc. No. 10, 77th Cong., 1st Sess., Part 2, p. 7. A 1939 amendment to the social security law requires hearings in the event a claimant is dissatisfied with the disposition of the case by the Bureau of Old-Age and Survivors Insurance. *Id.*, Part 3, p. 14. The Department of the Interior grants hearings in allocating grazing lands, *id.*, Part 7, pp. 9, 10; in disposing of applications for mineral leases, except where hearing would serve no useful purpose, *id.*, at 26; and in determining questions of fact necessary to issuing mining patents, *id.*, at 36. Hearings are frequently employed in investigations under flexible tariff procedures of the Tariff Commission, *id.*, Part 14, p. 12.

[17] The importance of opportunity to be heard is recognized as well by the English courts. The leading case is *Board of Education* v. *Rice*, [1911] A. C. 179. Lord Loreburn said in dictum, "In such cases the Board of Education will have to ascertain the law and also to ascertain the facts. I need not add that in doing either they must act in good faith and fairly listen to both sides, for that is a duty lying upon every one who decides anything. . . . They can obtain information in any way they think best, always giving a fair opportunity to those who are parties in the controversy for correcting or contradicting any relevant statement prejudicial to their view." *Id.*, at 182. This principle has been approved in a long line of decisions. See *Local Government Board* v. *Arlidge*, [1915] A. C. 120, 132–133; *General Medical Council* v. *Spackman*, [1943] A. C. 627; *Errington* v. *Minister of Health*, [1935] 1 K. B. 249; *Rex* v. *Westminster*, [1941] 1 K. B. 53. The Committee on Ministers' Powers reported in 1936 that while in administrative determination a Minister may "depart from the usual forms of legal procedure or from the common law rules of evidence, he ought not to depart from or offend against 'natural justice.'" Three principles of "natural justice" were

of demonstrable proof on which evidence is not likely to be overlooked and argument on the meaning and worth of conflicting and cloudy data not apt to be helpful. But in other situations an admonition of Mr. Justice Holmes becomes relevant. "One has to remember that when one's interest is keenly excited evidence gathers from all sides around the magnetic point . . . ."[18] It should be particularly heeded at times of agitation and anxiety, when fear and suspicion impregnate the air we breathe. Compare Brown, The French Revolution in English History. "The plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected." *United States ex rel. Knauff* v. *Shaughnessy,* 338 U. S. 537, 551 (dissenting). Appearances in the dark are apt to look different in the light of day.

Man being what he is cannot safely be trusted with complete immunity from outward responsibility in depriving others of their rights. At least such is the conviction underlying our Bill of Rights. That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depend on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss

stated to be that "a man may not be a judge in his own cause," that "No party ought to be condemned unheard," and that "a party is entitled to know the reason for the decision." Report of Committee on Ministers' Powers, Cmd. 4060, pp. 75–80.

[18] Mr. Justice Holmes made this remark in a letter to Mr. Arthur Garfield Hays in 1928. See Bent, Justice Oliver Wendell Holmes, 312.

notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.[19]

## V.

The strength and significance of these considerations—considerations which go to the very ethos of the scheme of our society—give a ready answer to the problem before us. That a hearing has been thought indispensable in so many other situations, leaving the cases of denial exceptional, does not of itself prove that it must be found essential here. But it does place upon the Attorney General the burden of showing weighty reason for departing in this instance from a rule so deeply imbedded in history and in the demands of justice. Nothing in the Loyalty Order requires him to deny organizations opportunity to present their case. The Executive Order, defining his powers, directs only that designation shall be made "after appropriate investigation and determination." This surely does not preclude an administrative procedure, however informal, which would incorporate the essentials of due process. Nothing has been presented to the Court to

---

[19] "In a government like ours, entirely popular, care should be taken in every part of the system, not only to do right, but to satisfy the community that right is done." 5 The Writings and Speeches of Daniel Webster, 163. The same thought is reflected in a recent opinion by the Lord Chief Justice. A witness in a criminal case had been interrogated by the court in the absence of the defendant. Quashing the conviction, Lord Goddard said: "That is a matter which cannot possibly be justified. I am not suggesting for one moment that the justices had any sinister or improper motive in acting as they did. It may be that they sent for this officer in the interests of the accused; it may be that the information which the officer gave was in the interests of the accused. That does not matter. Time and again this court has said that justice must not only be done but must manifestly be seen to be done. . . ." Rex v. Justices of Bodmin, [1947] 1 K. B. 321, 325.

indicate that it will be impractical or prejudicial to a concrete public interest to disclose to organizations the nature of the case against them and to permit them to meet it if they can. Indeed, such a contention could hardly be made inasmuch as the Loyalty Order itself requires partial disclosure and hearing in proceedings against a Government employee who is a member of a proscribed organization. Whether such procedure sufficiently protects the rights of the employee is a different story. Such as it is, it affords evidence that the wholly summary process for the organizations is inadequate.[20] And we have controlling proof that Congress did not think that the Attorney General's procedure was indispensable for the protection of the public interest. The McCarran Act, passed under circumstances certainly not more serene than when the Loyalty Order was issued, grants organizations a full administrative hearing, subject to judicial review, before they are required to register as "Communist-action" or "Communist-front." [21]

We are not here dealing with the grant of Government largess. We have not before us the measured action of Congress, with the pause that is properly engendered when the validity of legislation is assailed. The Attorney General is certainly not immune from the historic requirements of fairness merely because he acts, however conscientiously, in the name of security. Nor does he obtain immunity on the ground that designation is not an "adjudication" or a "regulation" in the conventional use of those terms. Due process is not confined in its scope to the particular forms in which rights have heretofore been

---

[20] Other evidence is furnished by the State of New York. The Feinberg Law, comparable in purpose and in its scheme to the Loyalty Order, makes notice and hearing prerequisite to designation of organizations. See *Thompson* v. *Wallin*, 301 N. Y. 476, 494, 95 N. E. 2d 806, 814–815.

[21] Act of September 23, 1950, §§ 13, 14, 64 Stat. 987, 998, 1001.

found to have been curtailed for want of procedural fairness. Due process is perhaps the most majestic concept in our whole constitutional system. While it contains the garnered wisdom of the past in assuring fundamental justice, it is also a living principle not confined to past instances.

Therefore the petitioners did set forth causes of action which the District Court should have entertained.

MR. JUSTICE DOUGLAS, concurring.

While I join in the opinion of MR. JUSTICE BURTON, which would dispose of the cases on procedural grounds, the Court has decided them on the Constitution. And so I turn to that aspect of the cases.

The resolution of the constitutional question presents one of the gravest issues of this generation. There is no doubt in my mind of the need for the Chief Executive and the Congress to take strong measures against any Fifth Column worming its way into government—a Fifth Column that has access to vital information and the purpose to paralyze and confuse. The problems of security are real. So are the problems of freedom. The paramount issue of the age is to reconcile the two.

In days of great tension when feelings run high, it is a temptation to take short-cuts by borrowing from the totalitarian techniques of our opponents. But when we do, we set in motion a subversive influence of our own design that destroys us from within. The present cases, together with No. 49, *Bailey* v. *Richardson, post,* p. 918, affirmed today by an equally divided Court, are simple illustrations of that trend.

I disagree with MR. JUSTICE JACKSON that an organization—whether it be these petitioners, the American Red Cross, the Catholic Church, the Masonic Order, or the Boy Scouts—has no standing to object to being labeled "subversive" in these *ex parte* proceedings. The opinion

of MR. JUSTICE FRANKFURTER disposes of that argument. This is not an instance of name calling by public officials. This is a determination of status—a proceeding to ascertain whether the organization is or is not "subversive." This determination has consequences that are serious to the condemned organizations. Those consequences flow in part, of course, from public opinion. But they also flow from actions of regulatory agencies that are moving in the wake of the Attorney General's determination to penalize or police these organizations.[1] An organization branded as "subversive" by the Attorney General is maimed and crippled. The injury is real, immediate, and incalculable.

The requirements for fair trials under our system of government need no elaboration. A party is entitled to

---

[1] The Bureau of Internal Revenue canceled the tax-exempt status of contributions to eight "subversive" organizations shortly after the Attorney General's list was released. The Bureau's announcement of the revocation indicated that the listing provided the basis for it. Treasury Dept. Press Release No. S–613, Feb. 4, 1948, 5 CCH 1948 Fed. Tax Rep. ¶ 6075.

The New York Feinberg Law, directed at eliminating members of subversive organizations from employment in the public schools, authorizes the Board of Regents to utilize the Attorney General's list in drawing up its own list of subversive organizations. Membership in a listed organization is *prima facie* evidence of disqualification. Laws of New York, 1949, c. 360, ¶ 3022 (2). The New York Superintendent of Insurance recently brought an action to dissolve the International Workers Order, Inc., petitioner in No. 71, on the grounds that it was on the Attorney General's list. *Matter of People of the State of New York*, Motion 165, Supreme Court of New York County, Dec. 18, 1950. [See 199 Misc. 941.]

The Maryland Ober Law requires candidates for appointive or elective office to certify whether they are members of "subversive" organizations. Laws of Maryland, 1949, c. 86, ¶¶ 10–15. The Commission which drafted the Act contemplated that the Attorney General's list would be employed in policing these oaths. Report of Commission on Subversive Activities to Governor Lane and the Maryland General Assembly, January, 1949, p. 43.

know the charge against him; he is also entitled to notice and opportunity to be heard. Those principles were, in my opinion, violated here.

The charge that these organizations are "subversive" could be clearly defined. But how can anyone in the context of the Executive Order say what it means? It apparently does not necessarily mean "totalitarian," "fascist" or "communist" because they are separately listed. Does it mean an organization with socialist ideas? There are some who lump Socialists and Communists together. Does it mean an organization that thinks the lot of some peasants has been improved under Soviet auspices? Does it include an organization that is against the action of the United Nations in Korea? Does it embrace a group which on some issues of international policy aligns itself with the Soviet viewpoint? Does it mean a group which has unwittingly become the tool for Soviet propaganda? Does it mean one into whose membership some Communists have infiltrated? Or does it describe only an organization which under the guise of honorable activities serves as a front for Communist activities?

No one can tell from the Executive Order what meaning is intended. No one can tell from the records of the cases which one the Attorney General applied. The charge is flexible; it will mean one thing to one officer, another to someone else. It will be given meaning according to the predilections of the prosecutor: "subversive" to some will be synonymous with "radical"; "subversive" to others will be synonymous with "communist." It can be expanded to include those who depart from the orthodox party line—to those whose words and actions (though completely loyal) do not conform to the orthodox view on foreign or domestic policy. These flexible standards, which vary with the mood or political philosophy of the prosecutor, are weapons which can be made as sharp or as blunt as the occasion requires. Since they are sub-

ject to grave abuse, they have no place in our system of law. When we employ them, we plant within our body politic the virus of the totalitarian ideology which we oppose.

It is not enough to know that the men applying the standard are honorable and devoted men. This is a government of *laws,* not of *men.* The powers being used are the powers of government over the reputations and fortunes of citizens. In situations far less severe or important than these a party is told the nature of the charge against him. Thus when a defendant is summoned before a federal court to answer to a claim for damages or to a demand for an injunction against him, there must be a "plain statement of the claim showing that the pleader is entitled to relief."[2] If that is necessary for even the most minor claim asserted against a defendant, we should require no less when it comes to determinations that may well destroy the group against whom the charge of being "subversive" is directed.[3] When the Government becomes the moving party and levels its great powers against the citizen, it should be held to the same standards of fair dealing as we prescribe for other legal contests. To let the Government adopt such lesser ones as suits the convenience of its officers is to start down the totalitarian path.

The trend in that direction is only emphasized by the failure to give notice and hearing on the charges in these cases and by the procedure adopted in *Bailey* v. *Richardson, supra.*

---

[2] Rule 8 (a), Federal Rules of Civil Procedure.

[3] As MR. JUSTICE FRANKFURTER points out, due process requires no less. But apart from due process in the constitutional sense is the power of the Court to prescribe standards of conduct and procedure for inferior federal courts and agencies. See *McNabb* v. *United States,* 318 U. S. 332.

178

Notice and opportunity to be heard are fundamental to due process of law. We would reverse these cases out of hand if they were suits of a civil nature to establish a claim against petitioners. Notice and opportunity to be heard are indispensable to a fair trial whether the case be criminal or civil. See *Coe* v. *Armour Fertilizer Works,* 237 U. S. 413, 424; *Palko* v. *Connecticut,* 302 U. S. 319, 327; *In re Oliver,* 333 U. S. 257, 273. The gravity of the present charges is proof enough of the need for notice and hearing before the United States officially brands these organizations as "subversive." No more critical governmental ruling can be made against an organization these days. It condemns without trial. It destroys without opportunity to be heard. The condemnation may in each case be wholly justified. But government in this country cannot by edict condemn or place beyond the pale. The rudiments of justice, as we know it, call for notice and hearing—an opportunity to appear and to rebut the charge.

The system used to condemn these organizations is bad enough. The evil is only compounded when a government employee is charged with being disloyal. Association with or membership in an organization found to be "subversive" weighs heavily against the accused. He is not allowed to prove that the charge against the organization is false. That case is closed; that line of defense is taken away. The technique is one of guilt by association—one of the most odious institutions of history. The fact that the technique of guilt by association was used in the prosecutions at Nuremberg[4] does not make it

[4] The International Tribunal tried Nazi organizations to determine whether they were "criminal." Art. 9, Charter of the International Military Tribunal, Nazi Conspiracy and Aggression, Vol. 1, Office of U. S. Chief Counsel, U. S. Government Printing Office (1946) p. 6. That procedure, unlike the present one, provided that accused

congenial to our constitutional scheme. Guilt under our system of government is personal. When we make guilt vicarious we borrow from systems alien to ours and ape our enemies. Those short-cuts may at times seem to serve noble aims; but we depreciate ourselves by indulging in them. When we deny even the most degraded person the rudiments of a fair trial, we endanger the liberties of everyone. We set a pattern of conduct that is dangerously expansive and is adaptable to the needs of any majority bent on suppressing opposition or dissension.

It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law. The case of Dorothy Bailey is an excellent illustration of how dangerous a departure from our constitutional standards can be. She was charged with being a Communist and with being active in a Communist "front organization." The Review Board stated that the case against her was based on reports, some of which came from "informants certified to us by the Federal Bureau of Investigation as experienced and entirely reliable."

---

organizations might defend themselves against that charge. *Ibid.* But the finding of guilt as to an organization was binding on an individual who was later brought to trial for the crime of membership in a criminal organization. Article 10 provided: "In cases where a group or organization is declared criminal by the Tribunal, the competent national authority of any Signatory shall have the right to bring individuals to trial for membership therein before national, military or occupation courts. In any such case the criminal nature of the group or organization is considered proved and shall not be questioned." *Id.*

Counsel for Dorothy Bailey asked that their names be disclosed. That was refused.

Counsel for Dorothy Bailey asked if these informants had been active in a certain union. The chairman replied, "I haven't the slightest knowledge as to who they were or how active they have been in anything."

Counsel for Dorothy Bailey asked if those statements of the informants were under oath. The chairman answered, "I don't think so."

The Loyalty Board convicts on evidence which it cannot even appraise. The critical evidence may be the word of an unknown witness who is "a paragon of veracity, a knave, or the village idiot."[5] His name, his reputation, his prejudices, his animosities, his trustworthiness are unknown both to the judge and to the accused. The accused has no opportunity to show that the witness lied or was prejudiced or venal. Without knowing who her accusers are she has no way of defending. She has nothing to offer except her own word and the character testimony of her friends.

Dorothy Bailey was not, to be sure, faced with a criminal charge and hence not technically entitled under the Sixth Amendment to be confronted with the witnesses against her. But she was on trial for her reputation, her job, her professional standing. A disloyalty trial is the most crucial event in the life of a public servant. If condemned, he is branded for life as a person unworthy of trust or confidence. To make that condemnation without meticulous regard for the decencies of a fair trial is abhorrent to fundamental justice.

I do not mean to imply that but for these irregularities the system of loyalty trials is constitutional. I do not see how the constitutionality of this dragnet system of loyalty trials which has been entrusted to the administrative agencies of government can be sustained. Every gov-

---

[5] Barth, The Loyalty of Free Men (1951), p. 109.

ernment employee must take an oath of loyalty.[6]  If he swears falsely, he commits perjury and can be tried in court.  In such a trial he gets the full protection of the Bill of Rights, including trial by jury and the presumption of innocence.  I am inclined to the view that when a disloyalty charge is substituted for perjury and an administrative board substituted for the court "the spirit and the letter of the Bill of Rights" are offended.[7]

The problem of security is real; and the Government need not be paralyzed in handling it.  The security problem, however, relates only to those sensitive areas where secrets are or may be available, where critical policies are being formulated, or where sabotage can be committed.  The department heads must have leeway in handling their personnel problems in these sensitive areas.  The question is one of the fitness or qualifications of an individual for a particular position.  One can be transferred from those areas even when there is no more than a suspicion as to his loyalty.  We meet constitutional difficulties when the Government undertakes to punish by proclaiming the disloyalty of an employee and making him ineligible for any government post.  The British have avoided those difficulties by applying the loyalty procedure only in sensitive areas and in using it to test the qualifications of an employee for a particular

---

[6] "The oath to be taken by any person elected or appointed to any office of honor or profit either in the civil, military, or naval service, except the President of the United States shall be as follows: 'I, A B, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter.  So help me God.' "  23 Stat. 22, R. S. § 1757, 5 U. S. C. § 16.  And see Act of Sept. 6, 1950, Pub. L. No. 759, § 1209, 64 Stat. 595, 764.

[7] See the address by Benjamin V. Cohen, 96 Cong. Rec. A785, A786.

post, not to condemn him for all public employment.[8]
When we go beyond that procedure and adopt the drag-
net system now in force, we trench upon the civil rights
of our people.   We condemn by administrative edict,
rather than by jury trial.[9]   Of course, no one has a con-

[8] 448 H. C. Deb. 1703 *et seq.*, 3418 *et seq.* (5th Ser. 1947–1948).
The meticulous care with which this small select group is handled is
reflected in the letter of the Prime Minister, dated Dec. 1, 1948,
reporting on the purge of communists and fascists from the civil
service.   459 H. C. Deb. 830 (5th Ser. 1948–1949).

The number of cases considered by the end of April, 1950, was 86,
classified as follows:

Transferred to nonsecret departments........................ 32
Resigned ................................................. 5
Exonerated and reinstated................................. 19
Dismissed (including one Fascist).......................... 7
Retired for health reasons before completion of investigations... 1
On special leave, either *sub judice* or confirmed Communists
   awaiting transfer or dismissal........................... 22
                                                   86

See British Information Services, Reference Division, April, 1950.

[9] The Civil Service Commission reports as of February, 1951, the
following statistics relating to adjudications of loyalty under Execu-
tive Order No. 9835 of March 21, 1947:

Total cases received by Loyalty Boards................... 14,910
   Less: cases where employee left the service during in-
      vestigations ..................................... 1,722

Cases received for adjudication........................... 13,188
   Less: cases where employee thereafter resigned......... 1,331
        field investigation reports pending in loyalty boards.. 1,060
        cases in Department of the Army................. 1,304
Cases adjudicated....................................... 9,493
   Eligible determination............................... 8,964
   Ineligible, excluding 20 cases on review................ 529
Disposition of ineligibles:
   Dismissed .......................................... 307
   Restored after appeal................................ 197
   Remanded after appeal.............................. 19
   On appeal.......................................... 26

stitutional right to a government job. But every citizen has a right to a fair trial when his government seeks to deprive him of the privileges of first-class citizenship.

The evil of these cases is only emphasized by the procedure employed in Dorothy Bailey's case. Together they illustrate how deprivation of our citizens of fair trials is subversion from within.

Mr. Justice Jackson, concurring.

It is unfortunate that this Court should flounder in wordy disagreement over the validity and effect of procedures which have already been pursued for several years. The extravagance of some of the views expressed and the intemperance of their statement may create a suspicion that the decision of the case does not rise above the political controversy that engendered it.

Mr. Justice Burton, and those for whom he speaks, would rescue the Loyalty Order from inquiry as to its validity by spelling out an admission by the Attorney General that it has been arbitrarily misapplied. Mr. Justice Black would have us hold that listing by the Attorney General of organizations alleged to be subversive is the equivalent of a bill of attainder for treason after the fashion of those of the Stuart kings, while Mr. Justice Reed contends, in substance, that the designation is a mere press release without legal consequences.

If the Court agreed that an accused employee could challenge the designation, its effect would be only advisory or prima facie; but as I point out later, the Court refuses so to limit the effect of the designation. In view of these and other diversified opinions, none of which has attracted sufficient adherents for a Court and none of which I can fully accept, I shall state rather than argue my view of the matter.

1. *The Loyalty Order does affect substantive legal rights.*—I agree that mere designation as subversive de-

184

prives the organizations themselves of no legal right or immunity. By it they are not dissolved, subjected to any legal prosecution, punished, penalized, or prohibited from carrying on any of their activities. Their claim of injury is that they cannot attract audiences, enlist members, or obtain contributions as readily as before. These, however, are sanctions applied by public disapproval, not by law. It is quite true that the popular censure is focused upon them by the Attorney General's characterization. But the right of privacy does not extend to organized groups or associations which solicit funds or memberships or to corporations dependent upon the state for their charters.[1] The right of individuals to assemble is one thing; the claim that an organization of secret undisclosed character may conduct public drives for funds or memberships is another. They may be free to solicit, propagandize, and hold meetings, but they are not free from public criticism or exposure. If the only effect of the Loyalty Order was that suffered by the organizations, I should think their right to relief very dubious.

But the real target of all this procedure is the government employee who is a member of, or sympathetic to, one or more accused organizations. He not only may be discharged, but disqualified from employment, upon no other ground than such membership or sympathetic affiliation. And he cannot attack the correctness of the Attorney General's designation in any loyalty proceeding.[2]

---

[1] *United States* v. *Morton Salt Co.*, 338 U. S. 632, 652.

[2] "Boards . . . should not enter upon any evidential investigation of the nature of any of the organizations identified in the Attorney General's list, for the purpose of attacking, contradicting, or modifying the controlling conclusion reached by the Attorney General in such list. . . . [T]he Board should permit no evidence or argument before it on the point." Loyalty Review Board, Memorandum No. 2, March 9, 1948.

Ordinary dismissals from government service which violate no fixed tenure concern only the Executive branch, and courts will not review such discretionary action.[3] However, these are not discretionary discharges but discharges pursuant to an order having force of law. Administrative machinery is publicly set up to comb the whole government service[4] to discharge persons or to declare them ineligible for employment upon an incontestable finding, made without hearing, that some organization is subversive. To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government employment so dominates the field of opportunity.

The fact that one may not have a legal right to get or keep a government post does not mean that he can be adjudged ineligible illegally. *Perkins* v. *Elg.*[5]

---

[3] *Eberlein* v. *United States,* 257 U. S. 82; *Keim* v. *United States,* 177 U. S. 290.

This is true, although reasons stated are alleged to be false or the officer taking the action is alleged to have acted in a biased, prejudicial and unfair manner. *Golding* v. *United States,* 78 Ct. Cl. 682, 685; cert. denied, 292 U. S. 643.

[4] "A total of 3,166 Government employees have quit or have been discharged under President Truman's loyalty program since it began March 21, 1947, the Loyalty Review Board reported today.

"Of these, 294 actually were discharged for disloyalty. The remainder, 2,872, quit while under investigation and might or might not have been found disloyal." New York Times, January 16, 1951.

[5] 307 U. S. 325, 349. That was an action to mandamus the Secretary of State to issue a passport, to which it was conceded Miss Elg had no legal right, its issuance being wholly within Executive discretion which the courts would not attempt to control. Chief Justice Hughes pointed out, however, that its denial to Miss Elg was not grounded in the Secretary's general discretion but "solely on the ground that she had lost her native born American citizenship." Finding that ground untenable, this Court directed its decree against the Secretary. The Secretary might say she would get no passport, but he could not, for unjustifiable reasons, say she was ineligible for one.

2. *To promulgate with force of law a conclusive finding of disloyalty, without hearing at some stage before such finding becomes final, is a denial of due process of law.*— On this subject, I agree with the opinion of Mr. Justice Frankfurter. That the safeguard of a hearing would not defeat the effectiveness of a Loyalty Program is apparently the judgment of Congress and of State Legislatures, for, as he points out, both congressional and state loyalty legislation recognize the right.

3. *The organizations may vindicate unconstitutional deprivation of members' rights.*—There are two stages at which administrative hearings could protect individuals' legal rights—one is before an organization is designated as subversive, the other is when the individual, because of membership, is accused of disloyalty. Either choice might be a permissible solution of a difficult problem inherent in such an extensive program. But an equally divided Court today, erroneously, I think, rejects the claim that the individual has hearing rights.[6] I am unable to comprehend the process by which those who think the Attorney General's designation is no more than a press release can foreclose attack upon it in the employees' case. Also beyond my understanding is how a Court whose collective opinion is that the designations are subject to judicial inquiry can at the same time say that a discharge based at least in part on them is not.

By the procedures of this Loyalty Order, both groups and individuals may be labeled disloyal and subversive. The Court grants judicial review and relief to the group while refusing it to the individual. So far as I recall, this is the first time this Court has held rights of individuals subordinate and inferior to those of organized groups. I think that is an inverted view of the law— it is justice turned bottom-side up.

---

[6] *Bailey* v. *Richardson,* 341 U. S. 918.

I have believed that a corporation can maintain an action to protect rights under the Due Process or Equal Protection Clauses of the Fourteenth Amendment, *e. g.*, *Wheeling Steel Corp.* v. *Glander*, 337 U. S. 562, 574. The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all.

This procedure is appropriate here where the Government has lumped all the members' interests in the organization so that condemnation of the one will reach all. The Government proceeds on the basis that each of these associations is so identical with its members that the subversive purpose and intents of the one may be attributed to and made conclusive upon the other. Having adopted this procedure in the Executive Department, I think the Government can hardly ask the Judicial Department to deny the standing of the organizations to vindicate its members' rights.

Unless a hearing is provided in which the organization can present evidence as to its character, a presumption of disloyalty is entered against its every member-employee, and because of it, he may be branded disloyal, discharged, and rendered ineligible for government service. I would reverse the decisions for lack of due process in denying a hearing at any stage.

MR. JUSTICE REED, with whom THE CHIEF JUSTICE and MR. JUSTICE MINTON join, dissenting.

The three organizations named in the caption, together with certain other groups and individuals, filed suits in the United States District Court for the District of Columbia primarily to have declared unconstitutional Executive Order No. 9835, March 21, 1947, 12 Fed. Reg. 1935, as applied against these petitioners. Acting un-

der Part III, § 3 of Executive Order No. 9835, note 3, *infra,* the Attorney General, on November 24, 1947, transmitted the required list of organizations to the Loyalty Review Board. This list included the three above-named organizations. The Board promptly disseminated the information to all departments and agencies. It was published as Appendix A to Title 5, Administrative Personnel, CFR § 210.11 (b) (6). 13 Fed. Reg. 1471. Later, September 17, 1948, the three organizations were designated by the Attorney General as "communist." 13 Fed. Reg. 6135. The relief sought by petitioners was to have the names of the organizations deleted from the allegedly unconstitutionally created lists because of the obvious harm to their activities by reason of their designation.

The list was transmitted to the Board by the Attorney General as a part of the plan of the President, broadly set forth in Executive Order No. 9835, to furnish maximum protection "against infiltration of disloyal persons into the ranks of [government] employees, and equal protection from unfounded accusations of disloyalty" for the loyal employees. 12 Fed. Reg. 1935. Executive Order No. 9835 came after long consideration of the problems of possible damage to the Government from disloyalty among its employees. 92 Cong. Rec. 9601. See the Report of the President's Temporary Commission on Employee Loyalty (appointed 1946), p. 23:

> "The presence within the government of *any* disloyal or subversive persons, or the attempt by *any* such persons to obtain government employment, presents a problem of such importance that it must be dealt with vigorously and effectively."

A list of subversive organizations under Executive Order No. 9300, 3 CFR, 1943 Cum. Supp., 1252, was likewise disseminated to government agencies. 13 Fed. Reg. 1473.

Great Britain (see note 31, *infra*), Australia (Act of October 20, 1950), New Zealand (*Deynzer* v. *Campbell*, [1950] N. Z. L. R. 790; 37th Rep., Public Service Comm'n, New Zealand, 1949, p. 14; 38th Rep., Public Service Comm'n, New Zealand, 1950, p. 12), and the Union of South Africa (Act No. 44 of 1950) have taken legislative or administrative steps to control disloyalty among government employees. See The Report of the Royal Commission (Canada) appointed under Order in Council, P. C. 411, February 5, 1946. The method of dealing with communism and communists adopted by the Commonwealth of Australia was held beyond the powers of that government. *Australian Communist Party* v. *Commonwealth*, decision of Friday, March 9, 1951, 83 C. L. R. 1.

The procedure for designating these petitioners as communists may be summarized as follows: Executive Order No. 9835, Part III, was issued by the President as Chief Executive, "in the interest of the internal management of the Government" and under the Civil Service Act of 1883, 22 Stat. 403, as amended, and § 9A of the Hatch Act, 5 U. S. C. (Supp. II) § 118j. The former acts give general regulatory powers over the employment and discharge of government personnel; the latter is more specific.[1] These present cases do not involve the removal of any employee.

---

[1] 5 U. S. C. (Supp. II) § 118j:

"(1) It shall be unlawful for any person employed in any capacity by any agency of the Federal Government, whose compensation, or any part thereof, is paid from funds authorized or appropriated by any Act of Congress, to have membership in any political party or organization which advocates the overthrow of our constitutional form of government in the United States.

"(2) Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the funds appropriated by any Act of Congress for such position or office shall be used to pay the compensation of such persons."

The Order required investigation of the loyalty of applicants for government employment and similar investigation of present employees. To assure uniformity and fairness throughout the Government in the investigation of employees, a Loyalty Review Board was created to review loyalty cases from any department or agency, disseminate information pertinent to employee loyalty programs, and advise the heads thereof. Standards were provided for employment and discharge. So far as pertinent to the objections of petitioner to inclusion on the list of subversive and communist organizations, they appear in note 3 and in the note below.[2] It was apparently to avoid the necessity of continuous reexamination by all government departments and agencies of the characteristics of organizations suspected of aims inimical to the Government that provision was made in the Order for examination and designation of such organizations by

---

[2] See 12 Fed. Reg. 1938, 5 CFR § 210.11 (a):

"(a) *Standard.* The standard for the refusal of employment or the removal from employment in an Executive department or agency on grounds relating to loyalty shall be that, on all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States. The panel shall reach its decision on consideration of the complete file, arguments, brief and testimony presented to it.

"(b) *Activities and associations.* Among the activities and associations of an applicant or employee which may be considered in connection with the determination of disloyalty may be one or more of the following:

. . . . .

"(6) Membership in, affiliation with or sympathetic association with any foreign or domestic organization, association, movement, group or combination of persons, designated by the Attorney General as totalitarian, fascist, communist, or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means."

the Attorney General.   12 Fed. Reg. 1938, Part III, § 3.[3]
It was under this plan that the Attorney General made
his designations.

The designations made available for the use of the
Loyalty Review Board and the departmental or agency
loyalty boards, the result of the investigation of the
Attorney General into the character of organizations that
might fall under suspicion as totalitarian, fascist, com-
munist or subversive.   The list does not furnish a basis
for any court action against the organizations so desig-
nated.   It of course might follow from discovery of facts
by the investigation that criminal or civil proceedings
would be begun to enforce an applicable criminal statute
or to cancel the franchise or some license of a listed
organization.   In such a proceeding, however, the accused
organization would have the usual protections of any
defendant.   The list is evidence only of the character of
the listed organizations in proceedings before loyalty
boards to determine whether "reasonable" grounds exist
for belief "that the employee under consideration" is dis-
loyal to the Government of the United States.   See note
2, *supra*.   The names were placed on the list by the At-
torney General after investigation.   If legally permissible,
as carried out by the Attorney General, there is no ques-
tion but that a single investigation as to the character of

---

[3] "3. The Loyalty Review Board shall currently be furnished by
the Department of Justice the name of each foreign or domestic
organization, association, movement, group or combination of persons
which the Attorney General, after appropriate investigation and de-
termination, designates as totalitarian, fascist, communist or sub-
versive, or as having adopted a policy of advocating or approving
the commission of acts of force or violence to deny others their
rights under the Constitution of the United States, or as seeking to
alter the form of government of the United States by unconstitutional
means.

"a. The Loyalty Review Board shall disseminate such information
to all departments and agencies."

an organization is preferable to one by each of the more than a hundred agencies of government that are catalogued in the United States Government Organization Manual. To require a determination as to each organization for the administrative hearing of each employee investigated for disloyalty would be impossible. The employee's association with a listed organization does not, under the Order, establish, even prima facie, reasonable grounds for belief in the employee's disloyalty.[4]

None of the complaints deny that the Attorney General made an "investigation" of the organizations to determine whether or not they were totalitarian, fascist, communist or subversive as required by Part III, § 3, or that he had material information concerning disloyal activities on their part. The Council came the nearest to such an allegation in the quoted excerpts from their complaint in note 10, but we read them as no more than allegations of unconstitutionality because "investigation" without notice and hearing is not "appropriate." Certainly there is no specific allegation of the way in which the Attorney General failed to follow the Order. We therefore assume that the designation was made after appropriate investigation and determination.[5]

---

[4] 5 CFR § 210.11 (b) (6):

"Such membership, affiliation or sympathetic association is simply one piece of evidence which may or may not be helpful in arriving at a conclusion as to the action which is to be taken in a particular case. . . ."

See 5 CFR § 200.1.

[5] 13 Fed. Reg. 1471:

"After the issuance of Executive Order No. 9835 by the President, the Department of Justice compiled all available data with respect to the type of organization to be dealt with under that order. The investigative reports of the Federal Bureau of Investigation concerning such organizations were correlated. Memoranda on each such organization were prepared by attorneys of the Department. The list of organizations contained herein has been certified to the Board

No objection is or could reasonably be made in the records or briefs to an examination by the Government into the loyalty of its employees. Although the Founders of this Republic rebelled against their established government of England and won our freedom, the creation of our own constitutional government endowed that new government, the United States of America, with the right and duty to protect its existence against any force that seeks its overthrow or changes in its structure by other than constitutional means. Tolerant as we are of all political efforts by argument or persuasion to change the basis of our social, economic or political life, the line is drawn sharply and clearly at any act or incitement to act in violation of our constitutional processes. Surely the Government need not await an employee's conviction of a crime involving disloyalty before separating him from public service. Governments cannot be indifferent to manifestations of subversion. As soon as these are significant enough reasonably to cause concern as to the likelihood of action, the duty to protect the state compels the exertion of governmental power. Not to move would brand a government with a dangerous weakness of will. The determination of the time for action rests with the executive and legislative arms. An objection to consideration of an employee's sympathetic association with an admitted totalitarian, fascist, communist or subversive group, as bearing upon the propriety of his retention or employment as a government employee would have no better standing. The Order gives conclusive indication of the type of organization that is meant by the four

———————

by the Attorney General on the basis of recommendations of attorneys of the Department as reviewed by the Solicitor General, the Assistant Attorneys General, and the Assistant Solicitor General, and subsequent careful study of all by the Attorney General."

Cf. *United States* v. *Chemical Foundation,* 272 U. S. 1, 14; *Lewis* v. *United States,* 279 U. S. 63, 73.

word-labels.[6]  Following them in Part III, § 3, 12 Fed. Reg. 1938, are the words, "or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means."  Bracketed with membership in listed organizations (Exec. Order No. 9835, Part V) as activities for consideration in determining an employee's loyalty are those listed below.  These are the standards that define the type of organization subject to designation.[7]  Of course, the Order means that a communist or subversive organization is of the same general character as one that seeks to alter our form of government by unconstitutional means, 13 Fed. Reg. 6137, to wit by force and violence.

Procedure under the Executive Order does not require "proof" in the sense of a court proceeding that these communist organizations teach or incite to force and vio-

---

[6] Cf. *Nash* v. *United States*, 229 U. S. 373, 377; *N. Y. Central Securities Corp.* v. *United States*, 287 U. S. 12, 24; *United States* v. *Petrillo*, 332 U. S. 1.

[7] 5 CFR § 210.11 (b):

"(1) Sabotage, espionage, or attempts or preparations therefor, or knowingly associating with spies or saboteurs;

"(2) Treason or sedition or advocacy thereof;

"(3) Advocacy of revolution or force or violence to alter the constitutional form of government of the United States;

"(4) Intentional, unauthorized disclosure to any person under circumstances which may indicate disloyalty to the United States, of documents or information of a confidential or non-public character obtained by the person making the disclosure as a result of his employment by the Government of the United States, or prior to his employment;

"(5) Performing or attempting to perform his duties, or otherwise acting, so as to serve the interests of another government in preference to the interests of the United States; . . . ."  See also n. 2, *supra.*

lence to obtain their objectives.[8]  What is required by the Order is an examination and determination by the Attorney General that these organizations are "communist."  The description "communist" is adequate for the purposes of inquiry and listing.  No such precision of definition is necessary as a criminal prosecution might require.  Cf. *United States* v. *Chemical Foundation*, 272 U. S. 1, 14.  Communism is well understood to mean a group seeking to overthrow by force and violence governments such as ours and to establish a new government based on public ownership and direction of productive property.  Undoubtedly, there are reasonable grounds to conclude that accepted history teaches that revolution by force and violence to accomplish this end is a tenet of communists.[9]  No more is necessary to justify an organization's designation as communist.

---

[8] In *Schneiderman* v. *United States*, 320 U. S. 118, 148, 158, a review of the evidence of communist theory upon the use of force and violence presented in that record led this Court to hold that the evidence concerning communist teaching upon force and violence was not so "clear, unequivocal and convincing" as to justify deportation of that defendant.  We refused specifically to pass upon the attitude of communism toward force and violence.  320 U. S. at 148, 158.

[9] The Russian Imperial Government fell quickly in February 1917, because its power had been sapped by bureaucratic rapacity and war losses as well as by communist revolutionary doctrines.  Even under those circumstances, there are said to have been more than a thousand casualties in St. Petersburg.  I Trotsky, History of the Russian Revolution, 141.

The doctrine and practices of communism clearly enough teach the use of force against an existing noncommunist government to justify an official of our Government taking steps to protect governmental personnel by screening individuals to determine whether they accept force and violence as a political weapon.  From the last paragraphs of the Communist Manifesto to the seizure of the last satellite, force and violence appears as a communist method for gaining control.  Lenin, Collected Works (1930), Vol. XVIII, pp. 279–280; Trotsky, *op. cit.*, 106, 120, 144, 151; Lenin, The State and Revo-

As a basis for petitioners' attack on the list, the Refugee Committee set forth facts in its complaint to show its charitable character. These indicate activities and expenditures in aid of the Spanish Republicans in flight from their homeland. The International Workers Order sets forth facts to show that it was a duly organized fraternal benefit society under New York law, furnishing sickness and death benefits as well as life insurance protection to its members. It states other worthy objectives in which it is engaged and asserts it is not an organization such as are referred to in the Order, Part III, § 3, *supra*. The Council, too, sets out its purpose to promote American-Soviet friendship by means of education and information. It asserts:

> "In all its activities the NATIONAL COUNCIL has sought to further the best interests of the American people by lawful, peaceful and constitutional means."

The absence of any provision in the Order or rules for notice to suspected organizations, for hearings with privilege to the organizations to confront witnesses, cross-examine, produce evidence and have representation of counsel or judicial review of the conclusion reached by the Attorney General is urged by the petitioners, as a procedure so fundamentally unfair and restrictive of personal freedoms as to violate the Federal Constitution, specifically the Due Process Clause and the First Amendment. No opportunity was allowed by the Attorney General for petitioners to offer proof of the legality of their purposes or to disprove charges of subversive opera-

---

lution, August, 1917, Foreign Languages Publishing House, Moscow (1949), 28, 30, 33. Translations furnished me indicate the same attitude on the part of Stalin. Collected Works, Vol. I, pp. 131–137, 185–205, 241–246; Vol. III, pp. 367–370. And see Leites, The Operational Code of the Politburo (1950), c. xiii, "Violence."

See § 2 of the Internal Security Act of 1950, 64 Stat. 987.

tions. This is the real gravamen of each complaint, the basis upon which the determination of unconstitutionality is sought.[10]

To these complaints, the Government filed motions to dismiss because of failure to state a claim upon which relief could be granted. The motions were granted by the District Court and the Court of Appeals affirmed.

*Admissions by motions to dismiss.*—It is held in MR. JUSTICE BURTON's opinion that the motion to dismiss should have been denied. It is said:

> "The inclusion of any of the complaining organizations in the designated list solely on the facts alleged in the respective complaints, which must be the basis for our decision here, is therefore an arbitrary and unauthorized act. In the two cases where the complaint specifically alleges the factual absence of any

---

[10] In the *Refugee Committee* complaint unconstitutionality of the designation was predicated upon repugnancy:

"1) It is repugnant to the Constitution of the United States as a deprivation of freedom of speech, of the press, and of assembly and association in violation of the First Amendment.

"2) . . . as a deprivation of the fundamental rights of the people of the United States reserved to the people of the United States by the Ninth and Tenth Amendments.

"3) . . . as a deprivation of liberty and property without due process of law in violation of the Fifth Amendment."

In the *Council* case, it was predicated upon a lack of "any advance notice" and the Attorney General's acting "without making 'an appropriate investigation and determination,' as required" by the Order. It was said:

"The aforesaid actions of the defendants have been arbitrary, capricious, contrary to law, in excess of statutory right and authority. Such actions have violated the rights of the plaintiffs guaranteed by the First and Fifth Amendments to the Constitution and are contrary to the Ninth and Tenth Amendments."

The same general allegations of violations of the Due Process Clause and the First Amendment appear in No. 71, *International Workers Order, Inc.*

basis for the designation, and the respondents' motion admits that allegation, the designation is necessarily contrary to the record." P. 137.

I understand MR. JUSTICE BURTON's opinion to hold that as a motion to strike for failure to state a cause of action admits all well-pleaded facts, respondents' motion admits such allegations in the complaint as that quoted in the third preceding paragraph from the Council's complaint and the assertions that petitioners are not "totalitarian, fascist, communist or subversive." Such statements, however, appear to me to be only conclusions of law as to the effect of facts stated, or empty assertions or conclusions without well-pleaded facts to sustain them.[11] Where the issue is the permissibility of designation without notice or hearing, a motion to strike does not admit an allegation of "arbitrary" action or that "all its activities [are] . . . constitutional." These complaints may not be decided upon any such posture in pleading. Petitioners' charge, that their "designation" violates due process and the First Amendment, remains the issue.

*Standing to sue.*—A question is raised by the United States as to petitioners' standing to maintain these actions. It seems unnecessary to analyze that problem in this dissent. If there should be a determination that petitioners' constitutional rights are violated by petitioners' designation under Part III, § 3, of the Order, it would seem they would have standing to seek redress. The "standing" turns on the existence of the federal right.[12] Does petitioners' designation abridge their rights under the First Amendment? Do petitioners have a constitutional right under the Due Process Clause of the Fifth

---

[11] *Nortz* v. *United States*, 294 U. S. 317, 324; *Pierce Oil Corp.* v. *City of Hope*, 248 U. S. 498; *Straus* v. *Foxworth*, 231 U. S. 162, 168.

[12] *Bell* v. *Hood*, 327 U. S. 678, 681, 684; *Larson* v. *Domestic & Foreign Corp.*, 337 U. S. 682, 690.

Amendment to require a hearing before the Attorney General designates them as a subversive or communist organization for the purposes of Executive Order No. 9835?

*First Amendment.*—Petitioners assert that their inclusion on the disloyal list has abridged their freedom of speech, since listeners or readers are more difficult to obtain for their speeches and publications, and parties interested in their work are more hesitant to become associates. The Refugee Committee brief adds that "thought" is also abridged. A concurring opinion accepts these arguments to the point of concluding that the publication of the lists "with or without a hearing" violates the First Amendment.

This Court, throughout the years, has maintained the protection of the First Amendment as a major safeguard to the maintenance of a free republic. This Nation has never suffered from an enforced conformity of expression or a limitation of criticism. But neither are we compelled to endure espionage and sedition. Wide as are the freedoms of the First Amendment, this Court has never hesitated to deny the individual's right to use the privileges for the overturn of law and order. Reasonable restraints for the fair protection of the Government against incitement to sedition cannot properly be said to be "undemocratic" or contrary to the guarantees of free speech. Otherwise the guarantee of civil rights would be a mockery.[13] Even when this Court spoke out most strongly against previous restraints, it was careful to recognize that "the security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government." *Near* v. *Minnesota,* 283 U. S. 697, 716.

---

[13] *United Public Workers* v. *Mitchell,* 330 U. S. 75, 95, and cases cited; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 394–399; *Feiner* v. *New York,* 340 U. S. 315, 320–321.

Recognizing that the designation, rightly or wrongly, of petitioner organizations as communist impairs their ability to carry forward successfully whatever legitimate objects they seek to accomplish, we do not accept their argument that such interference is an abridgment of First Amendment guarantees.[14] They are in the position of every proponent of unpopular views. Heresy induces strong expressions of opposition. So long as petitioners are permitted to voice their political ideas, free from suggestions for the opportune use of force to accomplish their social and economic aims, it is hard to understand how any advocate of freedom of expression can assert that their right has been unconstitutionally abridged. As nothing in the orders or regulations concerning this list limits the teachings or support of these organizations, we do not believe that any right of theirs under the First Amendment is abridged by publication of the list.

*Due Process.*—This point brings us face to face with the argument that whether the Attorney General was right or wrong in listing these organizations, his designation cannot stand because a final decision of ineligibility for employment without notice and hearing rises to the importance of a constitutional defect. If standards for definition of organizations includable on the list are necessary, the order furnishes adequate tests as appears from the text preceding notes 2 and 7 above and the standards set out in those notes. Compare cases cited, note 6, *supra.*

Does due process require notice and hearing for the Department of Justice investigation under Executive Order No. 9835, Part III, § 3, note 3, *supra,* preliminary to listing? As a standard for due process one cannot do better than to accept as a measure that no one may be deprived of liberty or property without such reasonable

---

[14] The fairness of that designation is considered under the next point.

notice and hearing as fairness requires. This is my understanding of the meaning of the opinions upon due process cited in the concurring opinions. We are not here concerned with the rightfulness of the extent of participation in the investigations that might be claimed by petitioners.[15] They were given no chance to take part. Their claim is that the listing resulted in a deprivation of liberty or property contrary to the procedure required by the Fifth Amendment.[16]

---

[15] Perhaps they would insist not only on notice that an investigation is to be had but on an opportunity to be present and to have counsel, to cross-examine, to object to the introduction of evidence, to argue and to have judicial review. Cf. *Hiatt* v. *Compagna*, 178 F. 2d 42, affirmed by an equally divided court, 340 U. S. 880. An injunction against listing could have delayed administration until today.

The statutory requirement for a hearing explains the statement in *Morgan* v. *United States*, 304 U. S. 1, 14, that "in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,'—essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an 'inexorable safeguard.'" This hearing was a rate determination proceeding.

See the statement in the first *Morgan* case, 298 U. S. 468, 480: "That duty is widely different from ordinary executive action. It is a duty which carries with it fundamental procedural requirements. There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact."

No enforceable rights to a hearing exist in an alien seeking admission to the United States. *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537, 544; *Ekiu* v. *United States*, 142 U. S. 651. To the extent that *Ng Fung Ho* v. *White*, 259 U. S. 276, requires a hearing, it is on the issue of alienage, and not of admissibility.

[16] Of course, notice to petitioners that an investigation was to be had to determine whether they had seditious purposes would be useless without opportunity for an administrative hearing. That is the effect of petitioners' argument.

The contention can be answered summarily by saying that there is no deprivation of any property or liberty of any listed organization by the Attorney General's designation. It may be assumed that the listing is hurtful to their prestige, reputation and earning power. It may be such an injury as would entitle organizations to damages in a tort action against persons not protected by privilege. See *Spalding* v. *Vilas,* 161 U. S. 483; *Glass* v. *Ickes,* 73 App. D. C. 3, 117 F. 2d 273. This designation, however, does not prohibit any business of the organizations, subject them to any punishment or deprive them of liberty of speech or other freedom. The cases relied upon in the briefs and opinions of the majority as requiring notice and hearing before valid action can be taken by administrative officers are where complainant will lose some property or enforceable civil or statutory right by the action taken or proposed.[17] "[A] mere abstract declaration" by an administrator regarding the character of an organization, without the effect of for-

---

[17] For example, *Shields* v. *Utah Idaho R. Co.,* 305 U. S. 177, interpreted a statutory requirement for determination by the Interstate Commerce Commission of the subjection of the railroad to the Railway Labor Act to necessitate procedural due process, "the hearing of evidence and argument." We held, p. 183, that equity had cognizance of an objection to the proceeding, as "arbitrary and capricious," p. 185, because failure to post a prescribed notice is punishable as a crime. A "right" was asserted.

Reliance on *Interstate Commerce Comm'n* v. *Louisville & N. R. Co.,* 227 U. S. 88, is misplaced. The statute gave a right to a full hearing, p. 91.

*United States* v. *Lovett,* 328 U. S. 303, 316, protected an employee against what this Court held was legislative decree of exclusion from government employment without trial.

*Columbia Broadcasting System* v. *United States,* 316 U. S. 407, 418, depends upon this Court's ruling that the regulation there subjected to attack required the Federal Communications Commission to reject applications and cancel outstanding licenses "on the grounds specified in the regulations without more."

bidding or compelling conduct on the part of complainant, ought not to be subject to judicial interference. *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 129, 143. That is, it does not require notice and hearing.

These petitioners are not ordered to do anything and are not punished for anything. Their position may be analogized to that of persons under grand jury investigation. Such persons have no right to notice by and hearing before a grand jury; only a right to defend the charge at trial.[18] Property may be taken for government use without notice or hearing by a mere declaration of taking by the authorized official. No court has doubted the constitutionality of such summary action under the due process clause when just compensation must be paid ultimately.[19] Persons may be barred from certain positions merely because of their associations.[20]

To allow petitioners entry into the investigation would amount to interference with the Executive's discretion, contrary to the ordinary operations of Government. Long ago Mr. Chief Justice Taney in *Decatur* v. *Paulding,* 14 Pet. 497, stated the rule and the reason against judicial interference with executive discretion:

> "The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. . . .
>
> "If a suit should come before this Court, which involved the construction of any of these laws, the Court certainly would not be bound to adopt the construction given by the head of a department.

---

[18] *Duke* v. *United States,* 90 F. 2d 840; *United States* v. *Central Supply Assn.,* 34 F. Supp. 241.

[19] 46 Stat. 1421, 40 U. S. C. A. § 258 (a), and annotations; *Catlin* v. *United States,* 324 U. S. 229, 231.

[20] *E. g.,* Underwriters from bank employment or direction. 48 Stat. 194, as amended, 49 Stat. 709, 12 U. S. C. § 78.

And if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But their judgment upon the construction of a law must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the act of Congress, in order to ascertain the rights of the parties in the cause before them." P. 515.

"The interference of the Courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied that such a power was never intended to be given to them." P. 516.

That rule still stands. *Larson* v. *Domestic & Foreign Corp.*, 337 U. S. 682, 704.[21] This Court applied it recently in *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, as to foreign policy decisions of the President concerning overseas airline licenses.[22] In *Louisiana* v. *McAdoo*, 234 U. S. 627, the State sought to

---

[21] This Court has declared the courts cannot supervise departmental action in discharge for inefficient rating, *Keim* v. *United States*, 177 U. S. 290, or enjoin leases of public lands where no contract rights are involved, *Chapman* v. *Sheridan-Wyoming Co.*, 338 U. S. 621, 625. Cf. *Work* v. *Rives*, 267 U. S. 175.

[22] It said, p. 111: "It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative."

And added, pp. 112–113:

"Until the decision of the Board has Presidential approval, it grants no privilege and denies no right. It can give nothing and can take nothing away from the applicant or a competitor. It may be a step which if erroneous will mature into a prejudicial result,

enjoin an order of the Secretary of the Treasury fixing the customs rate on sugar as "arbitrary, illegal and unjust" and irreparably injurious to the State. The Court refused the State permission to file the suit as in reality a suit against the United States, saying an officer may be compelled to act ministerially.

> "But if the matter in respect to which the action of the official is sought, is one in which the exercise of either judgment or discretion is required, the courts will refuse to substitute their judgment or discretion for that of the official entrusted by law with its execution. Interference in such a case would be to interfere with the ordinary functions of government." P. 633.

It seems clearly erroneous to suggest that "listing" determines any "guilt" or "punishment" for the organizations or has any finality in determining the loyalty of members. The President and the Attorney General pointed this out.[23] It is written into the Code of Federal Regulations,

---

as an order fixing valuations in a rate proceeding may foreshow and compel a prejudicial rate order. But administrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process."

[23] 5 CFR, App. A, p. 200, 13 Fed. Reg. 1471–1473:

"In connection with the designation of these organizations, the Attorney General has pointed out, as the President had done previously, that it is entirely possible that many persons belonging to such organizations may be loyal to the United States; that membership in, affiliation with, or sympathetic association with, any organization designated is simply one piece of evidence which may or may not be helpful in arriving at a conclusion as to the action which is to be taken in a particular case. 'Guilt by association' has never been one of the principles of our American jurisprudence. We must be satisfied that reasonable grounds exist for concluding that an individual is disloyal. That must be the guide."

5 CFR § 210.11 (b) (6), note 4, *supra*.  The standard for discharge emphasizes the meaning.  See notes 2 and 7, *supra*.

Before stating our conclusions a comment should be made as to the introduction by the concurring opinions of a discussion of the rights of a member of these organizations.  It is suggested by one concurrence that as the "Government proceeds on the basis that each of these associations is so identical with its members that the subversive purpose and intents of the one may be attributed to and made conclusive upon the other," the organization must be permitted to vindicate the members' rights or due process is not satisfied.  Another concurrence states "an employee may lose his job because of the Attorney General's secret and *ex parte* action."  Both concurrences indicate, it seems to me, that as a member of petitioner organizations is denied due process by the effect of listing the organizations, the organization is likewise denied due process in the listing.  Without accepting the logic of the concurrences, and waiving inquiry as to the standing of a corporation or unincorporated association to defend the rights of a member to employment, we think the suggestions as to lack of due process are based on an erroneous premise.  Employees generally, under executive departments and agencies, whether or not members of listed organizations, without special statutory protection such as permanent employees under the competitive and classified civil service laws and regulations or preference eligibles under the Veterans' Preference Act of 1944, 58 Stat. 387, 5 U. S. C. § 851, 5 CFR, Parts 9 and 22, and Part 2, § 2.104, are subject to summary removal by the appointing officers.[24]  Listing of these organiza-

---

[24] *Keim* v. *United States,* 177 U. S. 290; *United Public Workers* v. *Mitchell,* 330 U. S. 75, 102.  Classified civil service employees by statute shall have notice of the charges in writing and the privilege

tions does not conclude the members' rights to hold government employment. It is only one piece of evidence for consideration.[25] That mere membership in listed organizations does not normally bring about findings of disloyalty is graphically shown by a report of proceedings under the loyalty program.[26] The procedure for removal of employees suspected of disloyalty follows the routine prescribed for the removal of employees on other grounds for dismissal. Employees under investigation have never had the right to confrontation, cross-examination and quasi-judicial hearing. 37 Stat. 555, as amended, 5

---

of filing an answer with affidavits. The statute adds, "No examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer or employee directing the removal or suspension without pay." 37 Stat. 555, as amended, 5 U. S. C. § 652. And cf. Executive Order dated July 27, 1897, amending Civil Service Rule II, in 18th Report of the U. S. Civil Service Commission, at 282.

[25] 5 CFR § 220.2 (a) (6). See note 4, *supra.*

[26] "A total of 3,166 Government employees have quit or have been discharged under President Truman's loyalty program since it began March 21, 1947, the Loyalty Review Board reported today.

"Of these, 294 actually were discharged for disloyalty. The remainder, 2,872, quit while under investigation and might or might not have been found disloyal.

"The loyalty figures cover all 2,000,000 or more Government employees, plus the additional thousands hired since the program was begun in the spring of 1947.

"The regular monthly loyalty report showed that loyalty boards of the various Federal agencies had received 13,842 reports from the Federal Bureau of Investigation and other investigating agencies since March 21, 1947. This meant investigators found something about those persons that raised a question about their loyalty.

"Of the cases ruled on by loyalty boards, 8,371 were found loyal and 522 disloyal. Of the 522, 294 were discharged, 186 won their jobs back on appeal and forty-two are still awaiting decisions." New York Times, January 16, 1951.

See also n. 9 of Mr. Justice Douglas' concurrence.

U. S. C. § 652. Normal removal procedure functions for permanent employees about in this way. The employing agency may remove for the efficiency of the service, including grounds for disqualification of an applicant. 5 CFR, 1947 Supp., § 9.101.[27] Removal requires notice and charges.[28] Before the loyalty review boards similar procedure is followed.[29] Where initial consideration in-

---

[27] Disqualification grounds are in 5 CFR § 2.104 (a):

"(a) An applicant may be denied examination and an eligible may be denied appointment for any of the following reasons:

"(1) Dismissal from employment for delinquency or misconduct.

"(2) Physical or mental unfitness for the position for which applied.

"(3) Criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct.

"(4) Intentional false statements or deception or fraud in examination or appointment.

"(5) Refusal to furnish testimony as required by § 5.3 of this chapter.

"(6) Habitual use of intoxicating beverages to excess.

"(7) On all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States.

"(8) Any legal or other disqualification which makes the applicant unfit for the service."

Paragraph (7) is new. Cf. 12 Fed. Reg. 1938.

[28] 5 CFR § 9.102 (1):

"No employee, veteran or nonveteran, shall be separated, suspended, or demoted except for such cause as will promote the efficiency of the service and for reasons given in writing. The agency shall notify the employee in writing of the action proposed to be taken. This notice shall set forth, specifically and in detail, the charges preferred against him. The employee shall be allowed a reasonable time for filing a written answer to such charges and furnishing affidavits in support of his answer. He shall not, however, be entitled to an examination of witnesses, nor shall any trial or hearing be required except in the discretion of the agency."

See Part 22 for appeals under Veterans' Preference Act of 1944.

[29] 5 CFR, Part 220.

dicates a removal of an incumbent for disloyalty may be warranted, notice is provided for.[30] Thus, there is scrupulous care taken to see that an employee who has fallen under suspicion has notice of the charges and an opportunity to explain his actions. The employee has no opportunity to disprove the characterization placed upon the listed organization by the Attorney General for the practical reasons stated following note 2, *supra*. The employee does have every opportunity to explain his association with that organization. The Constitution requires for the employee no more than this fair opportunity to explain his questioned activities. Such procedure is quite similar to that followed in Great

---

[30] 5 CFR § 220.2 (f) and (g).

"(g) . . . The notice of proposed removal action required in paragraph (f) of this section shall state to the employee:

"(1) The charges against him in factual detail, setting forth with particularity the facts and circumstances relating to the charges so far as security considerations will permit, in order to enable the employee to submit his answer, defense or explanation.

"(2) His right to answer the charges in writing, under oath or affirmation, within a specified reasonable period of time, not less than ten (10) calendar days from the date of the receipt by the employee of the notice.

"(3) His right to have an administrative hearing on the charges before a loyalty board in the agency, upon his request.

"(4) His right to appear before such board personally, to be represented by counsel or representative of his own choosing, and to present evidence in his behalf."

*Id.*, § 220.3 (d):

"(d) *Presentation of evidence.* Both the Government and the applicant or employee may introduce such evidence as the board may deem proper in the particular case.

"The board shall take into consideration the fact that the applicant or employee may have been handicapped in his defense by the non-disclosure to him of confidential information or by the lack of opportunity to cross-examine persons constituting such sources of information."

Britain in the removal or transfer of civil servants from positions "vital to the security of the State." The Prime Minister assumed the authority to designate membership in the Communist Party or "other forms of continuing association" therewith as sufficient to bar employment in sensitive areas.[31]

*Conclusion.*—In our judgment organizations are not affected by these designations in such a manner as to

---

[31] The Prime Minister first described this program in a statement in the House of Commons, March 15, 1948, 448 H. C. Deb. 1703 ff., and in further detail on March 25, *id.* at 3418 ff. The standards for the program are set forth at 451 H. C. Deb., Written Answers, p. 118, in the form of instructions to three "advisers on Communists and Fascists in the Civil Service," retired civil servants designated to perform a function essentially parallel to that of the Loyalty Review Board here:

"1. The Government have stated that no one who is believed to be:—

"(i) either a member of the Communist Party or of a Fascist organisation; or

"(ii) associated with either the Communist Party or a Fascist organisation in such a way as to raise legitimate doubts about his reliability;

is to be employed in connection with work the nature of which is vital to the security of the State.

"2. You have been appointed to advise Ministers, in any cases referred to you, whether in your opinion their *prima facie* ruling that a civil servant comes under (i) or (ii) above is or is not substantiated. The decision on what employment is to be regarded as involving 'connection with work the nature of which is vital to the security of the State' is one not for you but for Ministers in charge of Departments.

"3. Your functions do not extend beyond advising the Minister whether the *prima facie* case has or has not been substantiated. You are not concerned with the action which he may decide to take in relation to the matter."

The Prime Minister stated that the civil servant concerned would be informed as specifically as possible of the charges against him, but

permit a court's interference or to deny due process. That conclusion holds good also when we assume the organizations may present their members' grievances over discharge as a part of the organization's case. The administrative hearing granted an employee facing discharge is a statutory modification of the employing agent's former authority to discharge summarily. Such act of grace does not create a constitutional right. Due process is called for in determinations affecting rights.

What petitioners seek is a ruling that the Government cannot designate organizations as communist for the purpose of furthering investigations into employees' loyalty by the employing agencies without giving those organizations an opportunity to examine and meet the information on which the list is based. One can understand that position. There is a natural hesitation against any action that may damage any person or organization through an error that notice and hearing might correct. Such attitude of tolerance is reflected in § 13 of the Internal Security Act of 1950, 64 Stat. 987, 998. A statutory requirement for notice and administrative hearing, how-

---

that "It is quite impossible—and everyone will realise that it is—that we should give in detail exactly the sources of information. If we do that, we destroy anything like an effective security service." *Id.*, Vol. 448, at 3423. He would be allowed to appear personally in response to charges. *Id.* at 3425.

While the program is primarily intended to effect the transfer of unreliable civil servants to jobs not vital to the security of the state (unless their technical training fits them only for security jobs), nevertheless it has apparently been extended to cover all jobs in certain agencies, such as the Air Ministry Headquarters. *Id.*, Vol. 452, at 940–941.

The Prime Minister did not answer directly questions as to the scope of the order in relation to "the telephone service and key telephone exchanges," *id.*, Vol. 448, at 1705, or "members of the Services who are engaged in dealing with secret processes." *Id.* at 1706.

ever, does not mean the existence of a constitutional requirement.[32]

The Executive has authority to gather information concerning the loyalty of its employees as congressional committees have power to investigate matters of legislative interest. A public statement of legislative conclusions on information that later may be found erroneous may damage those investigated but it is not a civil judgment or a criminal conviction. Due process does not apply. Questions of propriety of political action are not for the courts. Information that an employee associates with or belongs to organizations considered communistic may be deemed by the Executive a sound reason for making inquiries into the desirability of the employment of that employee. That is not "guilt by association." It is a warning to investigate the conduct of the employee and his opportunity for harm.

While we must be on guard against being moved to conclusions on the constitutionality of action, legislative or executive, by the circumstances of the moment, undoubtedly varying conditions call for differences in procedure. Due process requires appraisal in the light of conditions confronting the executive during the continuation of the challenged action.[33] Power lies in the executive to guard the Nation from espionage, subversion and sedition by examining into the loyalty of employees, and due process in such investigation depends upon the particular exercise of that power in particular conditions.[34] In investigations to determine the purposes of suspected organizations, the Government should be free to proceed without notice or hearing. Petitioners will have protec-

---

[32] Cf. *Standard Computing Scale Co.* v. *Farrell*, 249 U. S. 571.

[33] *Hirabayashi* v. *United States*, 320 U. S. 81, 93, 100.

[34] *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 426, 442.

tion when steps are taken to punish or enjoin their activities. Where notice and such administrative hearing as the Code of Federal Regulations prescribes precede punishment, injunction or discharge, petitioners and their members' rights to due process are protected.

The judgment of the Court of Appeals should be affirmed.